**GENUINE PARTS COMPANY, Plaintiff-Appellant-Cross Appellee,**

v.

**FEDERAL TRADE COMMISSION et al., Defendants-Appellees-Cross Appellants.**

**No. 30884.**

United States Court of Appeals,
Fifth Circuit.

July 21, 1971.

---

\* Rule 18, 5 Cir.; Isbell Enterprises, Inc. v. Citizens Casualty Company of New York, et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Alex P. Gaines, John K. Train, III, Atlanta, Ga., John H. Brebbia, Washing-

ton, D. C., for appellant; Alston, Miller & Gaines, Atlanta, Ga., of counsel.

John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., Charles C. Moore, Jr., Federal Trade Commission, Washington, D. C., Alan S. Rosenthal, Raymond D. Battocchi, Attys., Dept. of Justice, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., for appellees; Joseph Martin, Jr., Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, of counsel.

Before GEWIN, BELL and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is an appeal from an order of the District Court for the Northern District of Georgia directing the appellant Genuine Parts Company to comply with an Order to File a Special Report issued by the Federal Trade Commission (hereafter, the Commission or the F.T.C.) pursuant to a resolution of the Commission, dated December 18, 1967, authorizing a non-public investigation of Genuine Parts under Section 6 of the Federal Trade Commission Act, 15 U.S.C. § 46 (1963) (hereafter, the Act),[1] to determine whether there was reason to believe Genuine Parts had violated the antitrust laws in making certain acquisitions and corporate mergers. The district court's opinion is reported at 313 F. Supp. 855. The district court later amended its order and stayed the accrual of the penalties imposed for failure to respond to a special report order within thirty days after notice of default, under Section 10 of the Act, 15 U.S.C. § 50 (1963),[2] "pending final outcome of any appeal which may be taken from this order" and staying the judgment pending appeal insofar as it represents a judgment for enforcement of the Commission's order. The Commission cross-appeals from this portion of the order.

Genuine Parts is the largest warehouse distributor of automotive parts in the country, with annual sales in 1967 in excess of $204,000,000. It operates 35 warehouse distributor outlets in 22 states. A warehouse distributor such as Genuine Parts purchases automotive parts from manufacturers and then resells them to jobbers. Jobbers in turn stock a smaller inventory of parts and resell them to repair garages and service stations for use in maintenance or repair work for the ultimate consumer. Genuine Parts also operated 185 jobber stores or outlets scattered among the states in which its warehouses were located and rebuilt a limited number of types of automotive parts at three other locations.

The order to file a special report here in question was issued by the F.T.C. on December 28, 1967, in conjunction with an investigation of the automotive parts industry and was served on Genuine Parts on January 2, 1968. Genuine Parts was required to file its answer with the Commission within 90 days aft-

---

1. Section 6 provides in relevant part:
 The commission shall also have power—
 (b) To require, by general or special orders, corporations engaged in commerce, * * * to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the commission may prescribe, and shall be filed with the commission within such reasonable period as the commission may prescribe, unless additional time be granted in any case by the commission.

2. Section 10, 15 U.S.C. § 50, provides:
 * * * If any corporation required by sections 41–46 and 47–58 of this title to file any annual or special report shall fail so to do within the time fixed by the commission for filing the same, and such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure * * *.

er the date of issuance. The order contains about sixty questions divided into eight specifications, numbered I to VIII.[3] These specifications are further broken down into lettered questions. On March 27, 1968, Genuine Parts filed a report with the F.T.C. in which it responded to nineteen of the sixty questions, offered to respond to two other questions if they would be received *in camera* and treated as confidential. Genuine Parts offered no response[4] to the remaining thirty-nine questions, notwithstanding the preface of the F.T.C. order, which provided:

" * * * If any question cannot be answered fully, give such information as is available to you, and explain why your answer is incomplete and the source from which a more complete answer may be obtained. If books and records which provide accurate answers are unavailable, enter your best estimates, indicating the sources or bases of your estimates. * * * "

Instead of giving any explanation for its failure to respond to these questions, it stated in its report:

Genuine Parts Company respectfully refuses to respond to certain items of the Order on grounds, among others, that response to these items would be unduly burdensome; that the information sought by such items is irrelevant; and that the Order, insofar as it contains said items to which no response is made, is beyond the Commission's authority.

There were no specific objections in the report to any of the thirty-nine unanswered questions. At a conference with Commission representative on April 2, 1968, counsel for Genuine Parts informed the officials present that Genuine Parts would provide responses to the unanswered questions of the order only when ordered to do so by court order.

On July 26, 1968, about four months after the partial response to the special report order had been filed with the F.T.C., and Genuine Parts still not having replied to any of the unanswered questions, the Commission served upon it a notice of default, informing Genuine Parts that it was in default in failing to provide much of the information required by the December 28, 1967, order, and that if its failure continued it would become subject to a penalty of $100 for each day after the thirtieth day of the notice of default.[5] The notice specified each of the unanswered questions and then noted that Genuine Parts' answers to some of the other questions might be deficient in specified respects.

On August 14, 1968, Genuine Parts brought this action for declaratory and injunctive relief. By its complaint, Genuine Parts alleged that the Commission's order to file a special report constituted a denial of due process by requiring responses that were oppressive, unreasonably burdensome, irrelevant and beyond the scope and purpose of the investigation the Commission had undertaken, and sought a declaration that it need not comply with provisions of the Order and that any action the Commission might take to impose the statutory penalty of Section 10 would be illegal. Genuine Parts also sought what it termed a preliminary injunction to prevent the accrual of the penalty pending the resolution of the matter.

On August 21, 1968, a hearing was held before the district court on the preliminary injunction, and, although neither the court nor the F.T.C. had been apprised of Genuine Parts' specific objections to the unanswered questions, the court entered an order "that no

---

3. The titles of the eight specifications are: I, Corporate Background; II, Overall Operations; III, Warehouse Distributorships; IV, Wholly Owned Jobber Stores; V, Dependent Jobbers; VI, Rebuilding Operations; VII, Procurement; and VIII, Relations with NAPA (an association of parts jobbers).

4. As to each of these questions, the reply merely stated: "[No response]".

5. See n. 2, supra.

statutory penalties shall accrue under the provisions of Section 10 of the * * Act pending further order of this Court". Specific objections to the unanswered questions were first filed with the F.T.C. and the court on September 18, 1968. Upon suggestion of the district court, negotiations were entered into between the F.T.C. and counsel for Genuine Parts. These negotiations, however, proved fruitless and the F.T.C. filed a counterclaim seeking enforcement of its order of November 13, 1968.

The matter was set for hearing before the district court on January 6, 1969. At the hearing, however, Genuine Parts stated its intention to amend its complaint and file a motion for discovery. Genuine Parts was given until March 3rd to file its motion for discovery. The stated reason for the motion for discovery was to determine whether the F.T.C.'s actions toward Genuine Parts had shifted from the "investigative to the adjudicative stage". Genuine Parts based its belief that the mode of the proceeding before the Commission had shifted on an article in the October, 1968 issue of *Motor Age,* a trade magazine, which reported an interview with Mr. Paul Teetor, the F.T.C. counsel in charge of the Genuine Parts investigation, and stated that "cases * * * have been prepared" against four firms, including Genuine Parts, and that these firms were "caught in the Commission's web". In response to this motion, the F.T.C. filed three affidavits, one from Mr. Teetor and the two others from members of the F.T.C. staff involved in the Genuine Parts investigation, stating that the F.T.C. had not made a decision to issue a complaint against Genuine Parts and that no complaint had been prepared or drafted by any member of the F.T.C. staff.

On May 8, 1968, the district court denied the motion of Genuine Parts for discovery, stating that it saw "no way in which the depositions requested by [Genuine Parts] could be relevant to the constitutionality of the 'Order to File Special Report' which is the subject.

matter of the complaint", and that the time for such discovery would be after the Commission filed a complaint in an adjudicative proceeding. Genuine Parts filed a motion to amend this order or for the allowance of an interlocutory appeal under 28 U.S.C. § 1292(b). The F.T.C. opposed the motion to amend and filed a motion for summary judgment. The motion to amend was denied on August 7, 1969, and on November 4, 1969, a hearing was held on the merits of the order to file a special report.

On May 21, 1970, the district court entered a final order on the issues raised by the complaint. In summary, the final order held that Genuine Parts did not have to comply with the order to the extent that the underlying records necessary to respond to some of the questions were no longer in existence; defined certain disputed words and phrases used in the order; and ordered the remaining unanswered questions to be answered, either precisely as they had been presented by the F.T.C. or on the terms stated in the order.

On June 1, 1970, Genuine Parts filed a motion to alter or amend the May 21st order so as to delay the answers to certain questions until the F.T.C. had received other responses and demonstrated a need for the additional responses to the satisfaction of the district court; to enjoin the accrual of statutory penalties pending the exhaustion of appellate relief; and, insofar as the order constituted a judgment on the F.T.C. counterclaim for enforcement, that such judgment be stayed pending resolution of all appellate proceedings and subsequent district court proceedings.

On August 3, 1970, the district court denied the motion to alter or amend, but ordered that no penalties would accrue pending final outcome on appeal and stayed its judgment insofar as the order represents a judgment for enforcement of the Commission's order pending appeal. Genuine Parts subsequently filed notice of appeal and a cross-appeal was filed by the Commission.

The appellant Genuine Parts makes two main contentions: First, it contends that the district court erred in denying its motion to discover from the Commission whether the proceedings against it had shifted from the investigative to the adjudicative stage, so as to entitle it to the procedural safeguards provided for by the Commission's rules in adjudicative proceedings, notwithstanding the fact that no complaint had been filed against it by the F.T.C. Secondly, it contends that the district court erred in ordering it to respond to the question set out in Specifications V and VII, Sections (F), (G), (H), and (I), of the Commission's order on the ground that the questions are unreasonably burdensome, not reasonably relevant to the investigation and outside of the scope of the Commission's authority. The Commission, in its cross-appeal, contends that the district court erred in enjoining the accrual of penalties under Section 10 of the Act.

## I. *Discovery*

Genuine Parts takes the position in this appeal that when an F.T.C. investigation is no longer a general inquiry, but has begun to focus, and the Commission is in the process of gathering evidence to be used in an agency process for the formulation of an order in an adjudicative proceeding, prior to the formal initiation of that proceeding through the issuance and service of a complaint, the adjudicative process *substantively* commences and from that point forward the requirements of due process demand that further investigation be conducted pursuant to the procedural rules established by the Commission for adjudicative hearings. Cf. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). On this basis, Genuine Parts seeks the right to discover from the Commission facts which would enable the district court to find that the adjudicative process had, in substance, begun, and order the Commission to conduct any subsequent investigation according to the discovery rules applicable to adjudicative proceedings.[6]

■ We find this novel attempt to engraft the principle of *Escobedo* into the field of administrative law without merit.

■ Although it is quite possible to view investigative proceedings and adjudicative proceedings as merely constituent parts of the administrative enforcement process, they have long been recognized as separate and distinct proceedings serving different functions and entitling parties to different rights under the due process clause of the Fifth Amendment. In Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), the Supreme Court held that the procedures used by the Civil Rights Commission, a purely investigative body, did not violate due proces. In so doing the Court observed:

A typical agency is the Federal Trade Commission. Its rules draw a clear distinction between adjudicative proceedings and investigative proceedings. 16 C.F.R., 1958 Supp., § 1.34. Although the latter are frequently initiated by complaints from undisclosed informants, id., §§ 1.11, 1.15, and although the Commission may use the information obtained during investigations to initiate adjudicative proceedings, i d., § 1.42, nevertheless, persons summoned to appear before investigative proceedings are entitled only to a general notice of "the purpose and scope of such investigation," id., § 1.33, and while they may have the advice of counsel, "counsel may not, as a matter of right, otherwise participate in the investigation." Id., § 1.40. The reason for these rules is obvious. The Federal Trade Commission could not conduct an efficient investigation if persons being investigated were permitted to convert the investigation into a trial. We have found no authorities suggesting that

6. See Federal Trade Commission Rules of Practice and Procedure, 16 C.F.R. §§ 3.31–3.37, 15 U.S.C.A. (App.Supp.1971).

the rules governing Federal Trade Commission investigations violate the Constitution, and this is understandable since any person investigated by the Federal Trade Commission will be accorded all the traditional judicial safeguards at a subsequent adjudicative proceeding, * * * Id., 446, 80 S.Ct., 1517.

See also, F. T. C. v. Cinderella Career and Finishing Schools, Inc., 1968, 131 U.S.App.D.C. 331, 404 F.2d 1308. A further indication of the distinction recognized between investigative and adjudicative proceedings is the fact that "both industrywide investigations and adjudicative proceedings involving the same general subject matter may be instituted and conducted simultaneously" and "that the exercise of such dual functions by an administrative agency does not constitute a deprivation of due process". Lehigh Portland Cement Company v. F. T. C., E.D.Va., 1968, 291 F. Supp. 628, aff'd. per curiam 4 Cir., 1969, 416 F.2d 971(1).

■ The purpose of an investigative proceeding conducted by an administrative agency "is to discover and produce evidence not to prove a pending charge or complaint, but upon which to make one if, in the [agency's] judgment, the facts thus discovered should justify doing so". Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 201, 66 S.Ct. 494, 501, 90 L.Ed. 614 (1946). Thus, granting that to be effective an administrative investigation must focus on specific parties and particularized matters "to get information from those who best can give it and who are most interested in not doing so," United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950); such an investigation serves a function which is directly related to, but at the same time distinct from, the function of an adjudication. An investigation discovers and produces evidence; an adjudication tests such evidence upon a record in an adversary proceeding before an independent hearing examiner to determine whether it sustains whatever charg-

es are based upon it. A party under investigation may not contest the discovery and production of evidence in the same manner he may contest the use of that evidence in an adjudication by proper objection, by the introduction of other evidence, and the other safeguards traditional to an adversary proceeding under our system. An investigation does not determine guilt or innocence; that is done at the adjudication, and thus it is there the whole plethora of due process rights designed to insure the fairness of such a determination come to bear.

Aside from this, there are grave policy considerations that militate against allowing the process of administrative investigation to become adversary in nature, even after it becomes specific and particularized. These considerations were succinctly stated by the Supreme Court in Hannah v. Larche, supra, 363 U.S. at 443–444, 80 S.Ct. at 1515, where it stated:

* * * [T]he investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings * * *. Fact-finding agencies * * * would be plagued by the injection of collateral issues that would make the investigation interminable. * * * This type of proceedings would make a shambles of the investigation and stifle the agency in its gathering of facts.

■■ We therefore hold that there is no shift from the investigative to the adjudicative stage until a complaint is issued and served by the Commission on the party charged, 16 C.F.R. § 3.11(a) (1971), and until that point is reached the procedural safeguards required by due process in an adjudicative proceeding are unavailable.

## II. *Objections to Order to File Special Report*

Genuine Parts contends that two Specifications of the Special Report Order were not sufficiently limited by the district court in its order of May 21, 1970. Of these, Specification V seeks informa-

tion concerning the relationship between Genuine Parts and what the Order terms dependent jobbers; and Specification VII, of which Genuine Parts objects only to §§ (F) through (I), deals with Genuine Parts' relationship with its suppliers.[7] The district court clarified several of the questions contained in these

7. The challenged specifications provide as follows:

V. *Dependent Jobbers*

By supplying warehouse (identifying same), report the following information for each and every jobber customer of such warehouse (1) whose business on December 31, 1967 was partially owned, directly or indirectly by Genuine Parts, or (2) who on December 31, 1967 was indebted for any reason either to Genuine Parts or to a third party whose debt was guaranteed in any way by Genuine Parts (except indebtedness for rent due less than 30 days or merchandise bought on open account within the previous 60 days) or (3) who on December 31, 1967 had possession or custody of any merchandise consigned, leased or bailed to him by Genuine Parts; or (4) who on December 31, 1967 was renting his store and/or fixtures and/or equipment from Genuine Parts or from a third party whose rent was guaranteed by Genuine Parts; or (5) whose store was purchased by him from Genuine Parts and/or was subject to any kind of purchase or repurchase options in favor of Genuine Parts.

A. Name and address of jobber's business.

B. Genuine Parts total 1967 sales to this jobber (in dollars) and its approximate share (%) of his total purchases.

C. Genuine Parts 1967 sales of automotive parts, accessories and equipment to this jobber (in dollars) and its approximate share (%) of his total purchases of such products.

D. The percentage of equity in this jobber's business (whether in common or preferred stock, capital account or other) owned by Genuine Parts on December 31, 1967.

E. The total indebtedness owing from this jobber to Genuine Parts or guaranteed by it on December 31, 1967.

F. The portions (in dollars) of total indebtedness owing from this jobber to Genuine Parts or guaranteed by it on December 31, 1967 which arose out of the following causes:

(1) Open account for merchandise purchase more than 60 days but less than 120 days previously.

(2) Open account for merchandise purchased more than 120 days previously.

(3) Rent for any period ending more than 30 days but less than 90 days previously.

(4) Rent for any period ending more than 90 days previously.

(5) Loan from Genuine Parts.

(6) Loan guaranteed by Genuine Parts.

(7) Purchase price of jobber store and/or land.

(8) Purchase price of store fixtures and/or equipment.

(9) Other (specify).

G. The average interest rate charged this jobber during 1967 Genuine Parts or by the creditor guaranteed payment by Genuine Parts as interest on each class of indebtedness (1 thru 9) listed in answer to Question F above.

H. The dollar value of all merchandise belonging to Genuine Parts but by consignment, lease or bailment in the possession or custody of this jobber on December 31, 1967.

I. The dollar value of all merchandise belonging to the manufacturer or other supplier thereof but by reconsignment, sublease or double bailment through Genuine Parts in the possession or custody of this jobber on December 31, 1967.

J. The average monthly rental paid by this jobber during 1967 to Genuine Parts or to a lessor whose rent was guaranteed by Genuine Parts and (where such rental payments existed) the undepreciated book value of the rental property.

K. The price paid by this jobber for this store, including land, if purchased from Genuine Parts, and (where such purchase existed) the undepreciated value of the property purchased (on Genuine Parts' books just prior to purchase by this jobber).

\* \* \* \* \*

VII. *Procurement*

List all Genuine Parts' suppliers of automotive parts, accessories and equipment, including those affiliated with it, from whom its total net purchases were $100,000 or more during 1967 and for each such supplier report the following information on a separate page:

\* \* \* \* \*

F. The amount of all sales promotional or other kinds of services, including, but not exclusively, the providing of premiums, prizes, free goods, bargain

specifications and limited the response required by others.[8]

Genuine Parts argues that Specification V is too broad in scope and that any attempt to respond would be unreasonably burdensome because it would be required to report all of the detailed information called for on each jobber customer falling within any of the categories stated in the Specification's definitions of "dependent jobber". Genuine Parts makes similar objection to the controverted sections of Specifications VII on the grounds that it would be required to report each instance of financial or other assistance given to it or its jobber customers by suppliers named in response to the specification. It also objects to the descriptions used in Specification VII, such as "sales promotional or other kinds of services", and "advertising allowances".

> goods, cabinets, or other sales equipment and catalogues, any of which were provided to or for Genuine Parts or its jobber customers by or in behalf of this supplier during 1967, broken down by kinds of services rendered.
>
> G. The amounts of all advertising allowances or payments of money by or in behalf of this supplier to or for Genuine Parts or its jobber customers during 1967 which are not included in your answer to the next paragraph (H) broken down by kinds of payments made.
>
> H. Genuine Parts total dollar receipts (net) from this supplier for all sales by Genuine Parts of (1) all rebuilt automotive parts, and (2) all other goods and services sold to this supplier in 1967 broken down by kinds of products sold and services performed.
> I. The nature and dollar value of any and all other dealings between Genuine Parts and this supplier during 1967 not covered in your answers to paragraphs, F, G, and H above.
>
> \* \* \* \* \*

8. With regard to Specification V, the district court took the following action:

> (1) Genuine Parts need not attempt to identify jobbers who were in possession of any consigned merchandise if it "affirmatively represents in its response that the only consignment arrangement involving it and its jobbers was the battery program, and that such program was generally available to jobber customers, then Genuine Parts need not attempt to identify those jobbers who had batteries in their possession pursuant to the consignment program."
> (2) "Clause 5 of the introductory paragraph of Specification V will be enforced in the conjunctive sense but not in the disjunctive \* \* \*."
> (3) "Specification V, §§ B, C, must be complied with insofar as sales figures are concerned but will be enforced as to percentage figures only to the extent that such figures ·are known to Genuine Parts; if the figures are not known the answer should so state."
> (4) "Specification V, § F need not be answered at the present time; if after Genuine Parts has answered V, § E the Commission still wishes to have an answer to V, § F, Genuine Parts must either provide the answer or, at Genuine Parts' option, permit the Commission to obtain the information from Genuine Parts' files."
> (5) "Specification V, § G can be answered giving the average interested rate and any abberations therefrom, as to the various classes of indebtedness but need not specify the interest charged each customer listed in the answer to V, § A."
> (6) "Specifications V, § H and V, § I should be answered if Genuine Parts has the information in its files. It need not, however, survey all jobbers in order to obtain the information."
> (7) "Specifications V, § J and V, § K contain the word 'value' which can be given either in terms of cost or market value provided it is clear which is being used."

Genuine Parts responded to Specification VII after the institution of this action, but the Commission was dissatisfied with the adequacy of the response. The matter was briefed by both sides, and with respect to the sections here in issue, §§ F through I, the district court ordered:

> "\* \* \* that in answering §§ F and G Genuine Parts answer insofar as it has knowledge of such preferential services and allowances even though it has no control over them; and that Genuine Parts answer § I of the specification which it heretofore has completely ignored. \* \* \* if the information is not available or already has been supplied in full Genuine Parts should so state."

Genuine Parts Company v. F. T. C., supra, 313 F.Supp. 858-859.

▮ The chief limitation on an investigation by an administrative agency is that it must meet the test of reasonableness. Oklahoma Press Publishing Co. v. Walling, supra, 327 U.S. at 208, 66 S.Ct. 494.[9] In United States v. Morton Salt Company, supra, the Supreme Court set out the standard by which Section 6 investigations conducted by the F.T.C. are to be judged:

> * * * [I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant * * *. Id. at 652, 70 S.Ct. at 369.

At the same time the Court recognized the extreme breadth that must be accorded the Commission in conducting such an investigation.

> * * * Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest. Id. at ·652, 70 S.Ct. at 369.

▮▮ While an investigation under Section 6 may be objected to on the ground of oppressiveness and as requiring an unreasonably burdensome compliance, United States v. Associated Merchandising Corporation, S.D.N.Y., 1966, 261 F.Supp. 553, see F. T. C. v. Hunt Foods and Industries, Inc., S.D.Calif., 1959, 178 F.Supp. 448, aff'd. 9 Cir., 1961, 286 F.2d 803, cert. den. 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190, we do not think such an objection can be sustained in this case. It is clear that the demand contained in the F.T.C. Order here in question is within the authority of the Commission, is not too indefinite, and is reasonably relevant to the purpose of the investigation. Indeed, the portions of the Order here objected to go to the very heart of the inquiry—the relationship between Genuine Parts and its jobbers on the one hand and its suppliers on the other. When the degree of burdensomeness necessarily inherent in the preparation of a full response to the Order [10] is considered in light of the pertinent responses the objected portions of the Order will produce, we are unable to hold that the burden of compliance is unreasonable. We therefore hold that Genuine Parts must comply with the controverted portions of the Order, as limited by the district court, as well as those portions remaining unanswered which where not objected to in this appeal.

### III. Stay of Statutory Penalty

In contending that the district court erred in granting Genuine Parts a stay of the accrual of the penalty imposed by Section 10 of the Act upon failure to comply with an order to file a special report thirty days after issuance of a notice of default, the Commission advances two arguments: first, that the stay is void because Genuine Parts failed to exhaust its administrative remedies, relying on St. Regis Paper Co. v. United States, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240, reh. den. 368 U.S. 972, 82

9. There the Supreme Court stated:
Without attempt to summarize or accurately distinguish all of the cases, the fair distillation, insofar as they apply merely to the production of corporate records and papers in response to a subpoena or order authorized by law and safeguarded by judicial sanction, seems to be that the Fifth Amendment affords no protection by virtue of the self incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be "particularly described", if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable. 327 U.S. at 208, 66 S.Ct. at 505.

10. The president of Genuine Parts testified that it would require 1500 man hours to respond to the unanswered questions. This is less than half the time already expended in preparing the incomplete report.

S.Ct. 437, 7 L.Ed.2d 401 (1961), and United States v. Morton Salt Company, supra; and, second, that Genuine Parts failed to make any of the showings required to obtain an injunction of an administrative sanction, relying on Virginia Petroleum Job. Ass'n. v. Federal Power Com'n., 1958, 104 U.S.App.D.C. 106, 259 F. 2d 921, 925. Genuine Parts counters by contending that under *St. Regis Paper* persons served with an order to file a special report by the F.T.C. have the right to challenge that order in federal court after the notice of default has been served but before penalties begin to accrue under Section 10, and that such persons are entitled to a stay of the accrual of penalties during the pendency of such challenge.

It is clear from both United States v. Morton Salt Company, supra, and St. Regis Paper Co. v. United States, supra, that the Supreme Court has sanctioned, at least in *dicta,* the manner being used here to review an order to file a special report, and that a person under such an order has the right to seek review by way of an action for a declaratory judgment after the Commission serves it with a notice of default, but before the statutory penalty for failure to comply begins to accrue and without the necessity of awaiting action by the Commission seeking judicial enforcement of the order by way of injunction.[11] See Continental Baking Company v. Dixon, D.Del., 1968, 283 F.Supp. 285. But see Federal Trade Commission v. Claire

11. In *Morton Salt* the Court said:

It is argued that if we sustain this use of § 6, the power will be unconfined and its arbitrary exercise subject to no judicial review or control, unless and until the Government brings suit, as here, for penalties. The Government, it is said, may delay such action while ruinous penalties accumulate and defendant runs the risk that his defenses will not be sustained. However, we are not prepared to say that courts would be powerless if after an effort to clarify or modify such an order it still is considered to be so arbitrary as to be unlawful and the Government pursues a policy of accumulating penalties while avoiding a judicial test by refusing to bring action to recover them. Since we do not think this record presents the question, we do not undertake to determine whether the Declaratory Judgments Act, [28 U.S.C.A. §§ 2201, 2202], the Administrative Procedure Act, or general equitable powers of the courts would afford a remedy if there were shown to be a wrong, or what the consequences would be if no chance is given for a test of reasonable objections to such an order. Cf. Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596. It is enough to say that, in upholding this order upon this record, we are not to be understood as holding such orders exempt from judicial examination or as extending a license to exact as reports what would not reasonably be comprehended within that term as used by Congress in the context of this Act. 338 U.S. at 654, 70 S.Ct. at 370.
Similarly, in *St. Regis Paper*, the Court quoted from *Morton Salt*, stating:

Upon the commencement of the action by the Government, petitioner might have then sought a stay, as it did when the decision went against it in the Court of Appeals.[13] Moreover, after the entry of the notices of default by the Commission, petitioner might have itself sought relief before the § 10 forfeitures began to accrue instead of waiting for the Attorney General to sue for their collection. As was said in United States v. Morton Salt Co., 338 U.S. 632, 654, 70 S.Ct. 357, 94 L.Ed. 401, 417 (1950), "we are not prepared to say that courts would be powerless" to act where such orders appear suspect and ruinous penalties would be sustained pending a good faith test of their validity. There the record did not present and the Court did not determine "whether the Declaratory Judgments Act, the Administrative Procedure Act, or general equitable powers of the courts would afford a remedy if there were shown to be a wrong, or what the consequences would be if no chance is given for a test of reasonable objections to such an order." Similarly, as this matter comes here now, the petitioner has pursued none of these remedies, and we could not therefore say that it had "no chance" to prevent the running of the forfeiture pending a test of the validity of the orders. Cf. United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54, 58 (1952); Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, 310, 58 S.Ct. 199, 82 L.Ed. 276, 281 (1937). We note, however, that the Declaratory Judgments Act, 28 U.S.C. § 2201, provides that "In a case of actual controversy within its

Furnace Co., 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978 (1927), and Anheuser-Busch, Incorporated v. F. T. C., E.D.Mo., 1965, 242 F.Supp. 122, which hold that a person under an order to file a special report cannot seek judicial review prior to the issuance of a notice of default, triggering the forfeiture provisions of Section 10.

These cases, however, leave in doubt the two issues we face here: whether the person seeking to contest the Commission's order must exhaust his administrative remedies, if indeed any are or were available, and whether, and under what circumstances, such a person is entitled to a stay of the penalty pending review of the contested order.

### A. *Exhaustion of Remedies.*

 It is not contested that at the time this suit was filed the Commission's Rules of Practice and Procedure did not provide for any administrative procedure to contest the issuance or the terms of a special report order. Subsequently, and apparently in response to this litigation, the Commission amended its rules to provide that a person served with a special report order may file a motion with the Commission to limit or quash the order within 10 days after the special report order was served. 16 C.F.R. § 2.12(b), 15 U.S.C.A. (App.Supp.1971). Notwithstanding the absence of such a rule when this lawsuit was commenced, the Commission asserts that there was an informal procedure of which Genuine Parts ought to have been aware, which would have accorded it the same right of review now accorded by § 2.12(b) any

time before the issuance of the notice of default, and that the failure to exhaust this remedy barred it from seeking judicial review of the order, much less a stay of the statutory penalty.

In *Morton Salt,* supra, the Court refused to consider objections to the terms of a special report order, saying:

> If respondents had objected to the terms of the order, they would have presented or at least offered to present evidence concerning any records required and the cost of their books, matters which now rest on mere assertions in their briefs. The Commission would have had opportunity to disclaim any inadvertent excesses or to justify their demands in the record. We think these respondents could have obtained any reasonable modifications necessary, but, if not, at least could have made a record that would convince us of the measure of their grievance rather than ask us to assume it. 338 U.S. at 653–654, 70 S.Ct. at 369.

While this suggests the possibility of a procedure by which to make objections to the terms of an order before the Commission, it must be noted that the whole thrust of the controversy in *Morton Salt* was whether the Commission had authority to issue the order in the first place. No objection had been raised to the terms of the order until the case was before the Supreme Court. In this light the above-quoted passage from the opinion is at best ambiguous and could refer to the lack of a district court record on the issue, as well as the lack of any prior administrative proceeding. Likewise, in *St. Regis Paper,* supra, the existence of

jurisdiction \* \* \* any court \* \* \* may declare the rights \* \* \* of any interested party seeking such declaration. \* \* \* " This appears sufficient to meet petitioner's needs. 368 U.S. at 226–227, 82 S.Ct. at 299.

13. Petitioner unsuccessfully moved in the Court of Appeals for a postponement of the effective date of the Commission's orders. Coming when it did, however, we cannot say that such denial was an abuse of discretion. Cf. Virginian R. Co. v. United

States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463 (1926). Furthermore, a short while thereafter we stayed the accumulation of further penalties when the petition for writ of certiorari was granted. If petitioner had unsuccessfully sought a stay in the District Court, a different question might have been presented. That action, after final judgment, could have been reviewed both in the Court of Appeals and here.

such a procedure is suggested by the fact that the party under investigation filed a motion to vacate several special report orders prior to seeking judicial review and the Commission temporarily suspended the order while the motion was under consideration.[12] However, there is nothing in the opinion to indicate that such a motion was a necessary precondition to judicial review or that such motions to vacate were part of a well-established informal procedure before the Commission, rather than merely a good faith effort to avoid litigation by informal means.

Section 3(a) of the Administrative Procedure Act, now codified at 5 U.S.C. § 552(a) (1967), provides that " * * * [e]ach agency shall separately state and currently publish in the Federal Register for the guidance of the public—*, * (C) rules of procedure * * * " and that "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published". See United States v. Morton Salt Company, supra, 338 U.S. at 644, 70 S.Ct. 357. Even though the record before us indicates that Genuine Parts made every effort to avoid a timely presentation of its specific objections to the Commission, and in doing so in all probability unduly lengthened and complicated the present litigation, this Court is hesitant, on the authority here before us, to hold that Genuine Parts was barred from seeking judicial review as a result of its failure to exhaust an uncertain informal remedy, at the time unreported in the Federal Register. It must be noted, however, that in light of the Commission's new Rule § 2.12(b) this decision cannot offer solace to others of like mind who wish to "by-pass" the Commission in the future.

### B. *Availability of a Stay*

In *St. Regis Paper,* supra, the Supreme Court indicated that a stay could have been sought at the commencement of the action in the district court (brought by the Commission to enforce its special report order and for the forfeiture of accrued penalties) and, although it refused to hold that the court of appeals abused its discretion in denying a stay upon appeal, the Court itself stayed the accumulation of further penalties when it granted the petition for writ of certiorari. See n. 11, supra. Thus, it is clear that a stay of the accrual of Section 10 penalties is at least available in the type of review proceedings contemplated by *St. Regis Paper.* What is not clear is under what circumstances a person challenging a special report order is entitled to a stay. In discussing the availability of a stay in *St. Regis Paper,* the Court said: "we are not prepared to say that courts would be powerless 'to act where such *orders appear suspect* and ruinous penalties would be sustained pending a good faith test of their validity'" * * * "for a test of reasonable objections to such an order." (Emphasis supplied). 368 U.S. at 226–227, 82 S.Ct. at 300. The implication is that a stay of the accrual of Section 10 penalties would be appropriate whenever the challenged order "appears suspect" and the review seeks a "good faith test" of "reasonable objections" to the order. Such a stay was issued in Continental Baking Company v. Dixon, *supra,* 283 F.Supp. at 288, although the district court did not discuss the grounds upon which it granted the stay, except to cite *St. Regis Paper.*

█ It is thus left to determine whether the district court abused its discretion in granting the stay under the standard set out above. See St. Regis Paper Co. v. United States, supra, 368 U.S. at 226, n. 13, 82 S.Ct. 289. The

---

12. In *St. Regis Paper,* the Court simply noted:
* * * On motion of petitioner, the Commission temporarily suspended these orders while it considered petitioner's motion that they be vacated. On May 6, 1959, the motion to vacate was denied, and petitioner was directed to comply by May 28, 1959. * * * 368 U.S. at 214, 82 S.Ct. at 293.

Commission strongly argues that this action was brought in bad faith for the purpose of delaying any potential adjudication that might come about as a result of the information elicited by the special report order. Upon the record before us, such a contention is not without support. No real effort was made by Genuine Parts to obtain relief directly from the Commission to limit the questions contained in the order by informal discussion and some of the objections, particularly those concerning the definition of terms,[13] seem nothing less than picayune. However, the district court found it necessary to limit the order in certain respects in order to avoid any unreasonable burdensomeness, and for that reason alone, we are unable to say that it abused its discretion in granting the stay under what we understand to be the logic of *St. Regis Paper*. Now that the issues presented by Genuine Parts have finally, after inordinate delay, been decided, however, the stay must be dissolved upon the issuance of the mandate of this court.

The judgment of the district court is hereby in all things affirmed.

Affirmed.

---

13. For example, Genuine Parts strongly maintained the phrase "automotive parts, accessories and equipment" and the word "franchise" were too indefinite to enable it to even attempt to answer the questions in which they appeared.