**FORD MOTOR COMPANY, Plaintiff,**

**v.**

**William T. COLEMAN, Secretary of Transportation, et al., Defendants.**

**Civ. A. No. 75–1340.**

United States District Court, District of Columbia.

Sept. 22, 1975.

Abe Krash, Melvin Spaeth, Leonard H. Becker, Leonard B. Simon, of Arnold & Porter, Washington, D. C., for plaintiff.

John M. Kelson, Rex E. Lee, Harland F. Leathers, Dept. of Justice, Washington, D. C., Frank Berndt, and Henry Lederman, Department of Transportation, Washington, D. C., for defendants.

Before LEVENTHAL, Circuit Judge, and PARKER and HART, District Judges.

LEVENTHAL, Circuit Judge.

Ford Motor Company in this case challenges the constitutionality of §§ 108(a)(1)(D), 109, 152(a) and 155(b) of the 1974 amendments to the National Traffic and Motor Vehicle Safety Act of 1966, (Act), 15 U.S.C. §§ 1397(a)(1) (D), 1398, 1412(a) and 1415(b). It seeks a preliminary injunction in this three-judge district court[1] restraining the operation of the statutory penalties for noncompliance with the order of the National Highway and Traffic Safety Administration (NHTSA) to give notification to purchasers of 1968 and 1969 Mustang and Cougar automobiles and to remedy without charge any seat back pivot pin brackets in those cars.[2] Ford seeks a tolling of the penalties until it is able to obtain a judicial determination of the validity of the Administrator's underlying premise that seat pin breakage constitutes "a defect which relates to motor vehicle safety" within the meaning of the Act.[3] Ford maintains that the provision permitting a penalty of $800,000 for noncompliance creates an *in terrorem* atmosphere calculated to deter manufacturers from exercising their right to a *de novo* hearing in district court, and there to require the Government to meet the burden of showing by a preponderance of the evidence, that there exists a safety-related defect.[4] Ford objects to its exposure to penalties for (1) the initial noncompliance, asserting that the statutory procedure for obtaining a stay pending the outcome of the *de novo* district court hearing is constitutionally inadequate because it shifts the burden onto the manufacturer to show that his noncompliance was "reasonable" and that "he is likely to prevail on the merits";[5] and (2) possible future noncompliance with an additional order to give provisional notification, which the Administrator may issue should Ford succeed in staying the operation of the first set of penalties, and which cannot be avoided even if Ford ultimately wins on the merits.[6]

In our view, the proper construction of the Act, taking into account the statutory language, legislative history, and the sound doctrine that calls for interpretation in the light of traditional principles

---

1. 28 U.S.C. § 2282.

2. All 1968 and 1969 model Mustang and Cougars are two-door vehicles with folding front seat backs. The brackets which permit the seat to fold forward are welded to the sides of the seat bottom frame; the pivot pins hinge the brackets to the frame allowing the seat back to pivot forward. Failure, resulting from a fracture of the weld, is claimed by the Government to involve potential safety hazards in loss of vehicle control and injury from the rearward collapse of the seat itself. *See* Government Exh. 1, at 5, 29.

3. Section 102(1) defines "motor vehicle safety" as protection "against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and . . . against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles." 15 U.S. C. § 1391(1).

4. Memorandum of Points and Authorities of Plaintiff in Support of Motions for Temporary Restraining Order and Preliminary Injunction at 19–20, 30–33.

5. *Id.* at 14–15, 25; Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction at 4.

6. Memorandum of Points and Authorities, *supra* note 4, at 22, 26–30.

of equity in the federal courts, is consistent with constitutional dictates. In accordance with that construction, and in the exercise of its pendent jurisdiction, this court restrains the operation of the statutory penalties until Ford's motion for a preliminary injunction is ruled on in the Government's enforcement action, which was filed the same day as Ford's complaint, and has been assigned to District Judge Hart as a related case.[7] That injunction is in conformance with the Act, not predicated on the Act's unconstitutionality.

## I. STATUTORY FRAMEWORK AND FACTUAL BACKGROUND

Section 152(b), 15 U.S.C. § 1412(b) empowers the Administrator, as the Secretary of Transportation's delegate,[8] to require the manufacturer of a motor vehicle "which contains a defect which relates to motor vehicle safety" to furnish notification of the defect to owners, purchasers and dealers and to remedy it without charge. The determination of a safety-related defect is made on the basis of the Administrator's investigation and after an informal hearing at which the manufacturer has "an opportunity to present data, views and arguments" to show the absence of safety-relatedness.[9]

Noncompliance with a § 152(b) order constitutes a violation under § 108(a)(1)(D), 15 U.S.C. § 1397(a)(1)(D), exposing the manufacturer to a civil penalty under § 109, *id.* § 1398, not to exceed $1000 for each violation (presumably for each defect-marked motor vehicle) and $800,000 "for any related series of violations." The Secretary determines the amount of the penalty to be sought in light of "the appropriateness of such penalty to the size of the business of the person charged and the gravity of the violation. . . ."[10] But it is the

---

7. *United States v. Ford Motor Co.*, Civil Action No. 75-1345 (D.D.C., filed August 18, 1975).

8. 49 C.F.R. § 1.51(a) (1974).

9. Section 152, 15 U.S.C. § 1412, provides in relevant part:

 (a) If through testing, inspection, investigation, or research carried out pursuant to this chapter, or examination of communications under section 1418(a)(1) of this title, or otherwise, the Secretary determines that any motor vehicle or item of replacement equipment—

 (2) contains a defect which relates to motor vehicle safety; he shall immediately notify the manufacturer of such motor vehicle or item of replacement equipment of such determination, and shall publish notice of such determination in the Federal Register. The notification to the manufacturer shall include all information upon which the determination of the Secretary is based. Such notification (including such information) shall be available to any interested person, subject to section 1418(a)(2)(B) of this title. The Secretary shall afford such manufacturer an opportunity to present data, views, and arguments to establish that there is no defect or failure to comply or that the alleged defect does not affect motor vehicle safety; and shall afford other interested persons an opportunity to present data, views, and arguments respecting the determination of the Secretary.

 (b) If, after such presentations by the manufacturer and interested persons, the Secretary determines that such vehicle or item of replacement equipment does not comply with an applicable Federal motor vehicle safety standard, or contains a defect which relates to motor vehicle safety, the Secretary shall order the manufacturer (1) to furnish notification respecting such vehicle or item of replacement equipment to owners, purchasers, and dealers in accordance with section 1413 of this title, and (2) to remedy such defect or failure to comply in accordance with section 1414 of this title.

10. The full text of § 109, 15 U.S.C. § 1398, provides:

 (a) Whoever violates any provision of section 1397 of this title, or any regulation issued thereunder, shall be subject to a civil penalty of not to exceed $1,000 for each such violation. Such violation of a provision of section 1397 of this title, or regulations issued thereunder, shall constitute a separate violation with respect to each motor vehicle or item of motor vehicle equipment or with respect to each failure or refusal to allow or perform an act required thereby, except that the maxi-

court that determines whether a penalty shall be ordered and in what amount.

Enforcement takes place in the context of either an action under § 110(a), 15 U.S.C. § 1399(a), to restrain a violation of the § 152(b) order or under § 109 to collect a civil penalty with respect to such violation. The enforcement action is to be brought by the Government in the district court for the District of Columbia or for a judicial district in the state of incorporation of the manufacturer. Section 155(a), *id.* § 1415 requires expedited consideration and consolidation of "all actions . . . brought with respect to the same order," in accordance with the order of the court in which the first action is brought. During the pendency of an action relating to a § 152(b) order, the Secretary may, under § 155 (b), *id.* § 1415(b), order the manufacturer to issue provisional notification of the existence of the defect.[11]

The district court in such an action may hold the manufacturer liable for noncompliance with the § 152(b) order only upon finding, after a *de novo* hearing,[12] that the Secretary has established by a preponderance of the evidence the existence of a defect which relates to motor vehicle safety. Moreover, § 155 (c)(1), *id.* § 1415(c)(1), authorizes the court to "restrain the enforcement of such an order only if it determines, (A) that the failure to furnish notification is reasonable, and (B) that the manufacturer has demonstrated that he is likely to prevail on the merits." Liability for noncompliance with a § 155(b) provisional notification order, however, attaches regardless of the validity of the underlying § 152(b) determination, and no similar stay *pendente lite* procedure is set forth in the Act.[13]

In the case before the court, the Administrator notified Ford on March 13,

---

mum civil penalty shall not exceed $800,000 for any related series of violations.

(b) Any such civil penalty may be compromised by the Secretary. In determining the amount of such penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the person charged and the gravity of the violation shall be considered. The amount of such penalty, when finally determined, or the amount agreed upon in compromise, may be deducted from any sums owing by the United States to the person charged.

11. The additional provisional notice would contain a statement of the Secretary's determination of the existence of a safety-related defect, the basis for that determination, his evaluation of the attendant risk to motor vehicle safety and any measures he believes necessary to "avoid an unreasonable hazard resulting from the defect or failure to comply"; a statement that the manufacturer will remedy the defect or failure to comply without charge if he loses on the merits; and other matters the Secretary may prescribe by regulation or order.

12. In order "to expedite the disposition of safety-related defect and noncompliance matters without violating the constitutional rights of due process," Congress provided for informal procedures at the § 152(b) stage, and "due process would be satisfied

since there would be a trial *de novo* with the burden of proof on the Government to prove, by a preponderance of the evidence, that a safety-related defect or failure to comply exists" before the manufacturer could be held liable. H.Rep. No.93–1191, 93d Cong., 2d Sess. 17 (1974) ; U.S.Code Cong. & Admin.News, 1974, p. 6052. *See United States v. General Motors Corp.*, 518 F.2d 420, 426 (D.C.Cir., 1975) ; *United States v. General Motors*, 377 F.Supp. 242, 250 (D. D.C.1974). It should be noted that Congress expected the district court conducting the *de novo* proceeding "to give due consideration to the expertise of the agency in its consideration of the facts as to whether or not there was a defect and whether such defect was safety related." H.Rep. No.93–1452, 93d Cong., 2d Sess. 32 (1974) ; U.S.Code Cong. & Admin.News, 1974, p. 6096.

13. The full text of § 155(c), 15 U.S.C. § 1415(c), provides :

(c)(1) If a manufacturer fails to notify owners or purchasers in accordance with section 1413(c) of this title within the period specified under section 1413(b) of this title, the court may hold him liable for a civil penalty with respect to such failure to notify, unless the manufacturer prevails in an action described in subsection (a) of this section or unless the court in such an action restrains the enforcement of such order (in which case he shall not be liable with respect to any pe-

1975, that investigation indicated "that the front inboard seat back pivot arm pin bracket on 1968–69 Mustang and Cougars is subject to failure which can result in loss of vehicle control, accident or injury." [14] Ford was given an opportunity to present arguments and data in rebuttal, and rebuttal was presented on April 22, 1975. On August 12, 1975, Ford received notification of the Administrator's final determination that seat back pivot pin bracket breakage constitutes a safety-related defect, accompanied by a § 152(b) order to furnish notification and to remedy without charge. On August 18, 1975, Ford filed its complaint in district court, and applied for a temporary restraining order, preliminary injunction and convocation of a three-judge district court. The same day, the Government filed its enforcement action in the district court. Judge Hart granted the temporary restraining order. This three-judge court was duly convened. At argument, this court continued the restraint against enforcement of the penalty provisions pending further order of the court.

## II. JURISDICTION

■ The Government's brief contended that this court does not have jurisdiction to hear Ford's constitutional challenge because § 155(c)(1) provides the exclusive means for obtaining a stay of the penalties provision—as a motion

riod for which the effectiveness of the order was stayed). The court shall restrain the enforcement of such an order only if it determines, (A) that the failure to furnish notification is reasonable, and (B) that the manufacturer has demonstrated that he is likely to prevail on the merits.

(2) If a manufacturer fails to notify owners or purchasers as required by an order under subsection (b) of this section, the court may hold him liable for a civil penalty without regard to whether or not he prevails in an action (to which subsection (a) of this section applies) with respect to the validity of the order issued under section 1412(b) of this title.

14. Verified Complaint for Declaratory and Injunctive Relief, Exhibit A.

in the Government's enforcement action.[15] This jurisdictional contention was abandoned at oral argument,[16] and is without merit.

Under Ford's theory, the § 155(c)(1) stay procedure comes too late because the penalties for noncompliance have already worked their chilling effect on the right to seek judicial review of the order, and is constitutionally inadequate also because it places the burden of establishing a right to equitable relief on Ford, rather than require the Government to convince the court of the need for coercing immediate compliance. The challenge here is to the constitutional adequacy of the § 155(c)(1) stay in the context of civil penalties accruing immediately upon noncompliance. The jurisdictional objection would foreclose effective judicial consideration of Ford's constitutional objections. Ford is entitled to three-judge court review of the constitutionality of the statutory scheme as a whole.

Moreover, this Act does not embody a Congressional direction confining judicial jurisdiction to enforcement proceedings. Section 155(a)(1) of the statute, 15 U.S.C. § 1415(a)(1), expressly provides for consolidation of "[a]ll actions (including enforcement actions) brought with respect to the same order under" § 152(b). The stay procedure itself is not restricted in terms to enforcement actions.[17] Even if the § 155(c)(1) stay

15. Government's Motion to Dismiss at 10–12.

16. The Government conceded at the hearing that this court has jurisdiction, but asked that we decline to exercise jurisdiction where an enforcement action has been promptly filed. Tr. 47–49.

17. Unlike § 155(b), the provisional notification provision, § 155(c)(1) is not limited to "a civil action which relates to an order under [§ 152(b)] of this title, and to which [§ 155(a)(1)] applies. . . ." Although the legislative history indicates that pre-enforcement review actions would be subject to consolidation under § 155(a)(1), see H.Rep. No.93–1452, 93d Cong., 2d Sess. 32 (1974), it is silent on whether an action for a stay which does not seek review of the § 152(b) order itself can be obtained outside of the consolidated proceeding.

procedure were restricted to enforcement actions, in the absence of language unmistakably withdrawing all equitable jurisdiction outside of the enforcement proceeding [18] this court would have inherent power to do equity in the face of an unconstitutional statute. But rather than legislate such withdrawal, Congress was willing to permit even pre-enforcement review of § 152(b) orders, expressly leaving the question to the courts.[19] These provisions fall short of the "clear and convincing" congressional intent required before a statute will be construed to restrict access to judicial review,[20] here of the penalty scheme as a whole.

### III. THE PENALTY SCHEME

Ford's basic claim is that the penalty scheme is calculated to deter it from exercising its right to judicial review, by putting it to the Hobson's choice of either submitting to what it considers an erroneous agency determination based on informal procedures or challenging the order in the courts at the risk of a penalty of $800,000.[21] Ford argues that due process requires a tolling period during which it can secure a complete judicial review of the validity of the Government's order, and only upon a final judgment in the Government's favor should Ford's liability for noncompliance begin to run.

 We do not take up Ford's further objection to the provisional notification provision, as exacerbating the chilling effect of the penalty scheme by exposing Ford to liability for noncompliance even if the underlying agency determination is ultimately deemed unlawful. The Administrator has not ordered provisional notification in this case. In the absence of agency implementation of this section of the Act, we have no basis for determining its reach, let alone for measuring it against the command of the Constitution. The Administrator may view his authority to order provision notification as limited to emergency situations—where the defect can be correlated with a significant incidence of highway accident and injury.[22] The mere possibility that the Administrator might exerise that power in this case is too speculative to warrant judicial consideration at this juncture.

 As to Ford's principal claim, it our view that the statute, fairly read, permits the manufacturer who has a substantial, nonfrivolous challenge to the validity of the Adminstrator's determination to obtain a preliminary injunc-

---

18. *See, e. g.,* § 204(d) of the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 32–33 at issue in *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

19. While the Senate Bill specifically provided for pre-enforcement review, S.Rep.No.93–150, 93d Cong., 1st Sess. 6, 17 (1973), the House bill, whose provisions were ultimately enacted, took no position on the question, H.Rep.No.93–1191, 93d Cong., 2d Sess. 28 (1974). In conference, the House position was adopted. "The conferees discussed but decided to take no position on whether or not pre-enforcement judicial review was available under the turn of the conference substitute. The conferees decided to leave that question to the courts." H.Rep. No.93–1452, 93d Cong., 2d Sess. 32 (1974), U.S.Code Cong. & Admin. News, 1974, p. 6095.

20. *See Johnson v. Robison,* 415 U.S. 361, 373–74, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

21. Plaintiff at the hearing suggested that its total exposure was $1,600,000—$800,000 maximum penalty for noncompliance with the § 152(b) order and another $800,000 for noncompliance with a § 155(b) provisional notifications order. Tr. 3–4. The Government conceded the possibility of a double penalty on the premise that separate refusals, and hence "separate violations" within the terms of § 109, are involved. Tr. 67. Since we decide that the provisional notification provision is not ripe for constitutional attack here, *see* text at note 22 *infra,* we do not reach the double penalty issue.

22. Under a properly limited construction, § 155(b) may strike a fair, constitutional balance between the manufacturer's right to judicial review and the driving public's right to be alerted to dangers attending continued operation of defect-marked automobiles.

tion either in the Government's enforcement suit or, if the Government does not act promptly in bringing such a suit, in a pre-enforcement action. The court has jurisdiction to issue a temporary order restraining the operation of the penalties pending its determination of the motion for preliminary injunction, and to issue a preliminary injunction that will stay the accrual of the penalties until the completion of the *de novo* enforcement proceeding in district court on the underlying order. However, if the court hearing the preliminary injunction motion deems the challenge insubstantial, it may deny such full relief and start up the clock that it has temporarily suspended. In that event, the manufacturer must give notification and remedy in accordance with the Administrator's directive or risk the payment of penalties should it lose on the merits in the Government's enforcement action.

Ford's contentions carry the infirmity of causing the Constitution to forbid Congress from placing barriers in the path of insubstantial litigation, embarked upon for delay and in the hope that an agency may settle for less protection for the public than the law contemplates. In our view, and our reading of the cases, the basic constitutional requirement is satisfied if the manufacturer has an opportunity to convince a court that its grounds for contesting the validity of the order are substantial, and the adequacy of that opportunity is established where it is made available before liability for noncompliance attaches.

The pertinent doctrine was registered by Justice Van Devanter—acknowledged for his learning in matters of jurisdiction—in *St. Louis, Iron Mountain & Southern Railway Company v. Williams*, 251 U.S. 63, 64–65, 40 S.Ct. 71, 72, 64 L.Ed. 139 (1919):

It is true that the imposition of severe penalties as a means of enforcing a rate . . . is in contravention of due process of law, where no adequate opportunity is afforded the carrier for safely testing, in an appropriate judicial proceeding, the validity of the rate . . . before any liability for the penalties attaches. . . .

And it also is true that where such an opportunity is afforded and the rate is adjudged valid, or the carrier fails to avail itself of the opportunity, it then is admissible, so far as due process of law is concerned, for the State to enforce adherence to the rate by imposing substantial penalties for deviations from it.

In that case the state law provided a penalty of "not less than fifty dollars, nor more than three hundred dollars and costs of suit, including a reasonable attorney's fee" for each instance of a railroad's passenger rates exceeding statutory limits, *id.* at 64, 40 S.Ct. at 72. Justice Van Devanter found that there was constitutionally adequate opportunity "for safely testing" the rate in a judicial proceeding because of the railroad's ability "to secure a determination of [the validity of the statutorily prescribed rates] by a suit in equity against the Railroad Commission of the State, during the pendency of which the operation of the penalty provision could have been suspended by injunction." *Id.* at 65, 40 S.Ct. at 72. The crucial element —that the penalty "could have been suspended"—is far removed from Ford's contention that the penalty must automatically be suspended while it is litigating. Ford is afforded an adequate opportunity "for safely testing, in an appropriate judicial proceeding," the validity of the Administrator's directive, because it has the means to seek a suspension preventing penalties from accruing during litigation, assuming it can demonstrate grounds for injunctive relief—assuming it can show, what the Supreme Court has uniformly required in such cases, including *Oklahoma Operating Co. v. Love* on which Ford places em-

phasis, that the litigant had "reasonable ground to contest" the order.[23]

We have studied the line of cases cited by Ford—notably, *Ex parte Young, Wadley Southern Railway v. Georgia*, and *Oklahoma Operating Co. v. Love*—and are clear that they are consistent with the *Iron Mountain* teaching, that the Constitution is satisfied by the provision of an opportunity "for safely testing" administrative action.[24] They do not support the broader proposition asserted by Ford, that the Constitution dictates risk-free litigation. These decisions do take up a separate point, that the Constitution is offended when the penalty system is of such a nature as to create a virtual roadblock to judicial review. In *Ex parte Young*, where the statutes provided criminal sanctions, the Supreme Court noted that the risk of imprisonment may deter all challenge, as the manufacturer will be unable to find a willing violator among his employees, and the jury in a criminal trial will not be able to adequately scrutinize the validity of the underlying regulatory statute or order.[25] In this context the Court held that to impose on a party the burden of obtaining a judicial decision "only upon the condition that, if unsuccessful, he must suffer imprisonment and

---

23. In *Oklahoma Operating Co. v. Love*, 252 U.S. 331, 338, 40 S.Ct. 338, 340, 64 L.Ed. 596 (1920), Justice Brandeis, reviewing a scheme imposing cumulative sanctions for noncompliance with an administrative order setting maximum rates for laundry work, held that the Constitution required a stay of the statutory penalties *pendente lite*, "provided that it also be found that the plaintiff had reasonable ground to contest [the rates] as being confiscatory." The Court in *United States v. Morton Salt Co.*, 338 U.S. 632, 654, 70 S.Ct. 357, 370, 94 L.Ed. 401 (1950), citing Brandeis' opinion, characterized the constitutional requirement as a "chance . . . for a test of reasonable objections . . . ."

*United States v. Pacific Coast European Conference*, 451 F.2d 712 (9th Cir. 1971), also cited by Ford, required a restraint of penalties during the course of judicial review, but the court there specifically found that "defendants mounted a substantial attack upon the validity of the statute and order," and that a stay would have been ineffective to stop the penalties from accruing. *Id.* at 719.

24. In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the *only* opportunity for contesting the validity of the statutory rates was by defense in a jury trial for felony. Similarly, in *Oklahoma Operating Co. v. Love, supra*, the only judicial review obtainable was in a contempt proceeding.

The Court in *Wadley Southern Railway Co. v. Georgia*, 235 U.S. 651, 669, 35 S.Ct. 214, 59 L.Ed. 405 (1915), noted that had plaintiff railroad utilized the available opportunity for judicial review of the agency order it could be held liable only for noncompliance occurring after an adjudication of the order's validity. There is no indication in Justice Lamar's opinion, however, of any right to an automatic cessation of the penalties *pendente lite*.

More recent decisions of the Court indicate that what *Wadley* requires is an opportunity to obtain a stay upon a showing of the traditional grounds for equitable relief. Specifically addressing a *Wadley*-based attack on war-time price control legislation barring all interlocutory relief, the Court in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), noted that "the statute itself provides an expeditious meaning of testing the validity of any price regulation, *without necessarily incurring* any of the penalties of the Act," *id.* at 438, 64 S.Ct. at 674 (emphasis supplied), and that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," *id.* at 440, 64 S.Ct. at 674. More recently, the Court in *St. Regis Paper Co. v. United States*, 368 U.S. 208, 226–27, 82 S.Ct. 289, 300, 7 L.Ed.2d 240 (1961), rejected a *Wadley*-type argument, because since petitioners had the opportunity to obtain a "stay" upon commencement of the Government's enforcement action or prior to the accrual of penalties, "we could not therefore say that it had 'no chance' to prevent the running of the forfeitures pending a test of the validity of the orders." The Fifth Circuit has construed *St. Regis Paper Co.* to condition the grant of a stay on a showing that "the challenged order 'appears suspect' and the review seeks a 'good faith test' of 'reasonable objections' to the order." *Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1394 (5th Cir. 1971). *See also* cases cited in note 23 *supra*.

25. *Ex parte Young*, 209 U.S. 123, 145–46, 164–65, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

pay fines, as provided in these acts, is, in effect, to close up all approaches to the courts . . . ." [26] In the case at bar, by contrast, Congress contemplated and has provided for a judicial stay that will protect the contestant, assuming a threshold showing, even if unsuccessful on the merits, against accrual of penalties *pendent lite.* Furthermore, in *Ex parte Young,* and its line of cases, the appearance of a scheme providing cumulative penalties, mounting each day in severity, operated as a direct impost inflating with, and because of, the time required for the very exercise of the right to judicial review.[27]

■ In our view, the 1974 Amendments to the National Traffic and Safety Act, read in light of the legislative history and against the backdrop of general principles of federal equity practice, provide a constitutionally adequate tolling procedure, with the ultimate sanctions properly discretionary and noncumulative in nature.

### A. A Constitutionally Adequate Tolling Procedure

■ Section 155(c)(1) of the Act expressly provides for a judicial order of "restraint" in the Government's enforcement action—and this encompasses temporary restraining orders as well as preliminary injunctions. Congress in-

tended authority in the court to provide plenary protection through a "restraint" in an appropriate case. We think it plain, as Government counsel acknowledged at oral argument, that the statute's provision for a "restraint" encompasses both the temporary restraining order and the preliminary injunction (Tr. 35), that "a very low threshold of showing need be made" for a temporary restraining order (Tr. 37–38), and that the temporary restraint could have a retroactive effect, staying the accrual of penalties from the date of the Administrator's directive (Tr. 38). That restraint remains binding whether the further ruling is one granting or denying a preliminary injunction.

■ In any case where the manufacturer presents a nonfrivolous question, a temporary restraining order is appropriate, for the nonfrivolous question shows that "the failure to furnish [immediate] notification is reasonable," and the equitable context of the statute establishes power to issue a temporary restraining order until the court has had opportunity to hear and consider the motion for preliminary injunction and opposition thereto.

■ Furthermore, it is our view that although a manufacturer can obtain this relief in a nonfrivolous case in the enforcement action, there is jurisdic-

---

26. *Id.* at 148, 28 S.Ct. at 449.

27. *Id.* at 145, 28 S.Ct. 441 (penalty not to exceed $5,000 or 5 years' imprisonment, or both, for felony, with each ticket sale a separate violation); *Wadley Southern Railway Co. v. Georgia,* 235 U.S. 651, 653–54, 35 S. Ct. 214, 59 L.Ed. 405 (1916) (penalty not to exceed $5,000 per day for each day of continued violation); *Oklahoma Operating Co. v. Love,* 252 U.S. 331, 335, 337, 40 S.Ct. 338, 64 L.Ed. 596 (1920) (penalty not to exceed $500 per day for each day of noncompliance); *St. Regis Paper Co. v. United States,* 368 U.S. 208, 212 n. 1, 225, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961) (flat $100 a day penalty for each day of continued noncompliance after 30-day grace period); *United States v. Pacific Coast European Conference,* 451 F.2d 712, 714 (9th Cir. 1971) (penalty not to exceed $1,000 a day for each day of violation).

That this line of cases really goes to the cumulative nature of the penalty finds some support in the commentaries. *See* W. Gellhorn & C. Byse, Administrative Law: Cases and Comments 477 n. 24 (1970) ("If a money penalty for delay [in the commencement of Government enforcement proceedings] is so large and so inescapable that a respondent could not risk challenging an order he thought invalid, a denial of due process might result," *citing Ex parte Young, supra; Oklahoma Operating Co. v. Love, supra*); L. Jaffe, Judicial Control of Administrative Action 708 (1965) ("*Love* doctrine" does not extend to "every administrative order which becomes effective pendente lite [and] may eventually be enforced by penalties," but "is directed against huge cumulative penalties smacking of a purpose to block review").

tion in a district court to entertain a petition to review an order of notification-and-remedy, though filed before enforcement, if filed in one of the district courts which Congress contemplated as having venue of matters arising under this statute—the District Court for the District of Columbia, and the district where the manufacturer is incorporated.[28] The concept of meaningful judicial restraint would permit that court to enter a restraint pending the institution of an enforcement action and pending further consideration by the court in that enforcement action. If the enforcement action is brought promptly by the Government,[29] the action filed by the manufacturer should be consolidated with the enforcement action.[30]

Section 155(c)(1) permits the manufacturer to obtain a preliminary injunction if he can convince the court in the Government's enforcement action "that the failure to furnish notification is reasonable," and that "he is likely to prevail on the merits." [31] If the manufacturer makes this showing, he obtains a preliminary injunction which absolves him of liability for noncompliance *pendente lite*. Even if he has not previously obtained a temporary restraining order, the court has jurisdiction to issue an order of "restraint" that has a retroactive effect, tolling the penalties for the interim period between the point of noncompliance and its ruling, either way, on the application for preliminary injunction.[32] Insofar as Ford

---

**28.** As discussed above, Congress left it to the courts to determine whether the statute permitted pre-enforcement review. *See* notes 16, 19 and accompanying text *supra*. In line with the Third Circuit, *see General Motors Corp. v. Volpe*, 321 F.Supp. 1112, 1121 (D.Del.1970), *aff'd as modified*, 457 F.2d 922, 923–24 (3d Cir. 1972), we hold that there is jurisdiction in the specified district courts, under 28 U.S.C. § 1337, 5 U.S.C. § 701–06, and 28 U.S.C. § 2201–02, to entertain a pre-enforcement action.

**29.** If however, the Government fails to commence its enforcement action within a reasonable time after learning of the manufacturer's intention to challenge the notification-and-remedy order, the district court in the manufacturer's action could properly exercise its discretion to hear the manufacturer's motion for preliminary injunction. *See General Motors v. Volpe, supra*, 321 F.Supp. at 1130, *aff'd*, 457 F.2d at 924. The Government in this case concedes that full pre-enforcement review is available if its enforcement action is not promptly filed. Tr. 47. As the Supreme Court in *United States v. Morton Salt Co.*, 338 U.S. 632, 654, 70 S. Ct. 357, 369, 94 L.Ed. 401 (1950), responded to the charge that the Government may delay seeking enforcement in order to accumulate "ruinous penalties," "we are not prepared to say that courts would be powerless if . . . the Government pursues a policy of accumulating penalties while avoiding a judicial test by refusing to bring action to recover them." *See St. Regis Paper Co. v. United States*, 368 U.S. 208, 226–27, 82 S. Ct. 289, 7 L.Ed.2d 240 (1961). *See also* W. Gellhorn & C. Byse, Administrative Law: Cases and Comments 477 n. 24 (1970).

Since the Government in this case brought its enforcement suit with requisite promptness—in fact, it filed its suit on the same day that Ford filed its complaint—we find that Ford will suffer no prejudice if its motion for a preliminary injunction is decided in the Government's action.

**30.** Section 155(a)(1) contemplates consolidation in the district of the first enforcement action, providing that consolidation be "in accordance with an order of the court in which the first such action is brought . . . ." But it does not address itself to the possibility of a pre-enforcement action by a manufacturer. While we entertain the possibility of a need for a pre-enforcement action, we think it contrary to the spirit of the Act to encourage forum-shopping by the manufacturer. We agree with the Third Circuit in *General Motors v. Volpe, supra*, 457 F.2d at 923–24, that the pre-enforcement action should be transferred to the district of the enforcement action, if that action has been promptly instituted.

**31.** *Id.* § 1415(c)(1). It should be noted this provision, rather than encumber review, makes it easier for a manufacturer to obtain a stay by eliminating the usual requirement of a showing of irreparable harm, which may be a difficulty in this type of case, where there is little or no effect on the manufacturer's current business. *See General Motors Corp. v. Volpe, supra*, 321 F. Supp. at 1129.

**32.** Without pursuing the matter in over-elaborate detail, the court would have jurisdiction in an appropriate case to issue an order of restraint for this period even though it rules that no restraint will issue henceforth,

claims it wants a " 'grace period' in which to try for the preliminary [injunction] free from the threat of penalties,"[33] the statute permits that. The manufacturer will have had a meaningful day in court; the agency's order will not have obtained coercive effect in the face of a substantial challenge to its validity.

Ford argues that the § 155(c)(1) stay procedure is constitutionally defective because it contemplates the grant of a preliminary injunction only where plaintiff shows he is "likely to prevail on the merits," and this, it is argued, works a shift in the burden of proof which raises the cost of challenging the order to a constitutionally prohibitive level.[34] In our opinion, Ford misconstrues the statutory language and thereby overstates its plight. Since the ultimate burden of proof remains with the Government, probable success on the merits for a manufacturer in Ford's position means only, as the Government here concedes (Tr. 41–42, 43–44), that he need show that the evidence is (probably) in equipoise. By "evidence in equipoise" we mean that on some item that it is material for the Government to establish, as the party with the burden of proof, the court cannot fairly say whether the item or its contrary is the more probable. It is entirely sound and straightforward analysis, though perhaps novel in formulation, to say that at the preliminary injunction stage a manufacturer establishes a requisite likelihood of ultimate success on the merits,

if he shows at that time that the case is in equipoise as to a material item the Government must establish by a preponderence of evidence in the ultimate finding.

The statutory procedure does put on the manufacturer a burden of coming forward. It can discharge that burden by producing some evidence that its challenge is undergirded with substance. That burden is in substance no different from the showing generally required of litigants seeking to restrain the operation of a statute or regulation which, it is claimed, invalidly restricts their actions. Ordinarily, the statute or regulation is presumed valid, and regardless of the injury claimed to flow from the statute's operation, a preliminary injunction will not issue unless probable success on the merits is demonstrated.

There is no automatic right to interlocutory relief in the law. Even in the highly sensitive First Amendment area, where the courts are alert to remove "prior restraints" on protected expression, a "persuasive demonstration" of likely success on the merits is a necessary predicate to obtaining a preliminary injunction.[35] Moreover, where preservation of the status quo operates to the active detriment of the non-moving party, probable success on the merits takes on added importance as the critical prerequisite for relief.[36] Particularly where the public interest may be sacrificed by the grant of a preliminary injunction, courts of equity require a substantial showing by the moving party

and that the prayer for a continuing preliminary injunction is denied. The Government appears to have conceded this point (Tr. 38).

33. Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction at 4.

34. Rather than have penalties attend a judicial determination of the order's validity after a de novo hearing at which the Government must justify its actions by a preponderance of the evidence, Ford argues that the statute arms the agency with coercive penalties which take effect immediately, and places the burden on the manufacturer to secure a tolling by proving its case on the

motion for a preliminary injunction. Memorandum of Points and Authorities of Plaintiff in Support of Motions for Temporary Restraining Order and Preliminary Injunction at 14–15, 25.

35. See, e. g., A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 181–82, 421 F.2d 1111, 1116–17 (1969).

36. See, e. g., Delaware & Hudson Railway Co. v. United Transportation, 146 U.S.App. D.C. 142, 158–59, 450 F.2d 603, 619–20, cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971) (action by rail carriers to enjoin selective striking by union).

of the strength of its claim. "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."[37] If the public interest is important enough, it may even justify an outright ban on all interlocutory relief, even though the effect is to confer immediate coercive power on administrative orders.[38] This Act, of course, does not go nearly that far.

■ In light of the above, we cannot say that § 155(c)(1) works an injury of constitutional dimension because it places the initial burden of coming forward on the manufacturer, to make some showing on, to establish at least substantiality for, the claim of invalidity of an order to give notification to consumers who may be driving unsafe vehicles.

This is the reality of the "restraint" procedure under the Act:

(1) Once Ford comes forward with evidence establishing the substantiality of its objections, it obtains a preliminary injunction, subject to (2). (2) The injunction will be denied if the Government meets the burden of proving its case, as to the existence of a safety-related defect, sufficiently to overcome the claim of mere equipoise, notwithstanding the proof tendered by the manufacturer. (3) If the preliminary injunction is denied, the manufacturer may continue to resist compliance, and to litigate, only by shouldering an exposure to an assessment of penalties if it loses on the merits.

### B. Discretionary, Noncumulative Penalties

Ford would have a basis for attacking the statutory scheme if the penalties attached to noncompliance were inflexibly set at an amount "so heavy as to erect an unfair barrier against the endeavor of an honest litigant to obtain the judgment of a court." Life & Casualty Co. v. McCray, 291 U.S. 566, 574–75, 54 S.Ct. 482, 486, 78 L.Ed. 987 (1934).

But this is plainly not such a case. It does not bear the infirmity existing in most of the cases relied on by plaintiff, where the penalty involved criminal sanctions, including imprisonment,[39] or was cumulative—per day of violation—so that the time naturally required for substantial litigation served to penalize the act of litigating.[40] The cases upholding the substantially similar penalty provision of the National Traffic and Motor Vehicle Act, before its amendment in 1974,[41] have found this distinction conclusive. Nor is there even a minimum

---

37. *Virginian Ry. v. System Federation No. 40*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). See *Yakus v. United States, supra*, 321 U.S. at 440–42, 64 S.Ct. 660, 88 L.Ed. 834; *Abbott Laboratories v. Gardner*, 387 U.S. 136, 155–56, 87 S.Ct. 1507, 18 L.Ed.2d 674 (1967); *Associated Securities Corp. v. SEC*, 283 F.2d 773, 775 (10th Cir. 1960); *Floersheim v. Weinberger*, 346 F.Supp. 950, 956 (D.D.C.1972), dismissed for lack of juridsiction, 161 U.S.App.D.C. 30, 494 F.2d 949 (1973). See generally, 11 Wright & Miller, Federal Practice & Procedure: Civil § 2948, at 457–60 (1973).

Representative Staggers, the principal author of the 1974 amendments, specifically urged the courts, in determining whether or not to restrain enforcement of the Administrator's directive, to consider "whether the public would not be adversely affected by [the manufacturer's] failure to notify." Cong. Rec. H 10571 (daily ed. Oct. 15, 1974).

38. But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.

*Yakus v. United States, supra*, 321 U.S. at 440, 64 S.Ct. 660. The Court in *Yakus* held that preservation of the integrity of wartime price controls justified a statutory scheme which restricted manufacturers seeking to contest the validity of a price regulation to an exclusive review procedure, and which precluded any court from granting an interlocutory injunction staying enforcement of the regulation before final adjudication of its validity.

39. See note 25 and accompanying text *supra*.

40. See note 27 and accompanying text *supra*.

41. *General Motors Corp. v. Volpe*, 321 F.Supp. 1112, 1126 n. 25 (D.Del.1970), aff'd as modified, 457 F.2d 922, 923 (3d Cir.

penalty. Section 109(a) of the Act[42] protects the manufacturer with two separate limitations prescribing maxima on civil penalties. One maximum is $1,000 per violation. The other is the overall maximum of $800,000 for any related series of violations. Even in gross, the $800,000 figure must be taken in conjunction with the fact that the class which will be affected—manufacturers or assemblers of motor vehicles or motor vehicle equipment—will not be denied access to the courts. It may well be within the range of the cost of litigation for such challenges.[43] More important, the $800,000 figure represents a maximum, not a minimum. There clearly is room for the court to set a substantially lower figure. The statute expressly authorizes the court to consider "the size of the business of the person charged and the gravity of the violation" in determining the amount of the penalty. Moreover, as the Government seems to concede (Tr. 42–43), the reasonableness and good faith of the manufacturer's noncompliance may properly be considered in mitigation of the statutory maximum.[44] And it must be reiterated that even this exposure will attach only if the court has denied a preliminary injunction because it was convinced, as of that time, that the proof was not in equipoise, but rather more on the Government's side. The denial of a preliminary injunction, moreover, is not conclusive with regard to the penalties ultimately assessed, for in appraising

good faith for purposes of assessing civil penalties the court can take it into account that in the case at hand the manufacturer had substantial strengths on the merits, and was not merely relying on judicial disinclination to treat even a weak dispute as sham. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconsideration between the public interest and private needs . . . ." *The Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

In this overall context, the statute does not give a right to judicial consideration that is only "nominal and illusory [because] the party to be affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to ask for the protection of the law." *Wadley Southern Ry. v. Georgia,* 235 U.S. 651, 661, 35 S. Ct. 214, 218, 59 L.Ed. 405 (1915). There is no risk unless the party is unable to convince the court to issue a preliminary restraint, and in that case its exposure is "no more than the fair price of the adventure" of contesting the order; "the litigant must pay for his experience, like others who have tried and lost." *Life*

---

1972) ; *United States v. General Motors Corp.,* 385 F.Supp. 598, 604 (D.D.C.1974).

The only significant change, pertinent here, in the penalty scheme wrought by the 1974 amendments was to double the maximum penalty from $400,000 to $800,000.

42. The text is found at note 10 *supra.*

43. *See United States v. General Motors Corp.,* 385 F.Supp. 598, 604 (D.D.C.1974) ; *Brown & Williamson Tobacco Corp. v. Engman,* C.A. No. 75 Civ. 4047 (S.D.N.Y. August 28, 1975), slip op. at 6.

44. Although the Government in *United States v. General Motors Corp.,* 385 F.Supp. 598, 603 (D.D.C.1974), sought $400,000, the statutory maximum at that time, Judge Gasch

assessed only $100,000, because this was a case of first impression and therefore General Motors was "not acting in blatant disregard of a well-defined area of the law."

The courts have exercised similar discretion under the analogous penalty provision of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*). *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 229 n. 6, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) ; *United States v. J. B. Williams Co.,* 498 F.2d 414, 438 (2d Cir. 1974) ; *Floersheim v. Engman,* 161 U.S.App.D.C. 30, 33–35, 494 F.2d 949, 952–54 (1973) ; *Brown & Williamson Tobacco Corp. v. Engman, supra,* at 5 ; *United States v. Beatrice Foods Co.,* 322 F.Supp. 139, 141 (D.Minn.1971).

## 490

and Casualty Co. v. McCray, 291 U.S. 566, 575, 54 S.Ct. 482, 486, 78 L.Ed. 987 (1934).

### IV. EXPEDITED REVIEW

 The procedure for temporary relief outlined above envisions a foreshortening of the district court review process. Many, if not most challenges will be resolved, for all intents and purposes, by the disposition of the motion for preliminary injunction rather than after a more extensive trial. Litigants who fail to obtain temporary relief may well prefer to comply rather than press on in the hope of changing the court's appraisal, with the risk of both litigation costs and civil penalties.[45] But due process is not offended by expedition, as long as nonfrivolous claims can be reasonably aired.

Moreover, insofar as the statute does not give the manufacturer a "free ride" —to litigate without any risk of penalties—it advances the important public policy, embodied in the 1974 amendments, of a "timely remedy", and prompt adjudication of controversies relating to highway and motor vehicle safety.[46]

 The public interest embraces measures to add a surcharge to deter frivolous litigation.[47] The 1974 amendments to the National Traffic and Motor Vehicle Safety Act sought to deter frivolous litigation by attaching a cost to challenges, without substantial merit, maintained for purposes of delaying the implementation of the statutory mandate.[48] We believe that Congress can constitutionally penalize such challenges, particularly where the public interest in safety demands prompt corrective action, as long as manufacturers can obtain an expedited hearing at which they can petition for immunity from penalties *pendente lite* upon a showing that their non-compliance rests on a challenge that is substantial.

Plaintiff's motion for a preliminary injunction, enjoining enforcement of the penalty scheme of the Act, as unconstitutional, is denied. It is in compliance

45. As this court stated in *Delaware & Hudson Railway Co. v. United Transportation Union*, 146 U.S.App.D.C. 142 at 159, 450 F. 2d 603 at 620:

> The duty to appraise the merits at the stage of preliminary injunction is a duty of appellate as well as trial courts. Usually this appraisal is phrased in terms of probability or substantial likelihood of success after trial. Sometimes, however, the interest of justice is furthered by providing a determination on the merits, both at the trial court and on appeal, if and to the extent that the matter is ripe, notwithstanding that technically the only matter submitted is a request for a preliminary injunction. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584–85, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

In *Youngstown Sheet & Tube Co.*, the Supreme Court decided issues of great constitutional moment—presidential implied power to order seizure of the nation's steel mills— even though the case proceeded no further than the preliminary injunction stage.

46. Congress laid great stress on the importance of a "timely remedy," to give the driving public the quickest possible notice and remedy of safety-related defects, consistent with due process. *See* H.Rep. No.93–11, 93d Cong. 2d Sess. 16–17, 29 (1974).

47. On the problems of frivolous litigation in the labor area, *see International Union of Electrical Workers v. NLRB [Tiidee Products]*, 138 U.S.App.D.C. 249, 426 F.2d 1243, cert. denied 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); Note, NLRB Remedies —Attorney's Fees in Refusal-to-Bargain Cases, 1975 Duke L.J. 352.

48. Citing instances of manufacturer recalcitrance to give notification and remedy without charge, H.Rep. No.93–1191, *supra* note 46, at 16, the House Committee on Interstate and Foreign Commerce provided that noncompliance with the Administrator's notification-and-remedy order constituted a prohibited act, so that "when a manufacturer decides to contest the Secretary's determination of a defect or failure to comply, he does so at the risk of facing an enforcement proceeding brought by the Government and incurring a civil penalty for violations of section 108 of the 1966 Act, as amended by this bill," *id.* at 18.

The hearings in the House indicate that the penalty provision was viewed as an alternative to criminal sanctions for securing compliance with the Act. Hearings before House Committee on Interstate and Foreign Commerce, Subcommittee on Commerce and Finance, on H.R. 7505, H.R. 5529, and S. 355, Pt. 1, 93d Cong., 1st Sess. 389 (1973).

with the Act, and not in its teeth, that in the exercise of its pendent jurisdiction this court issues a preliminary restraint, pending ruling by the District Court in the enforcement action on plaintiff's timely application in that action for a preliminary injunction.

Judge PARKER concurs in all respects in the foregoing opinion.

HART, District Judge (dissenting).

## I. INTRODUCTION

This case arises under the National Traffic and Motor Vehicle Safety Act of 1966 (the "Act"), 80 Stat. 718, 15 U.S.C. § 1381 *et seq.*, as amended by the Motor Vehicle and Schoolbus Safety Amendments of 1974, 88 Stat. 1470. A three judge court has been convened pursuant to 28 U.S.C. § 2282–2284 (1970) to examine Plaintiff Ford Motor Company's complaint which seeks to have this court declare invalid and restrain the enforcement, operation and execution of certain penalty provisions of the Act as amended in 1974 on the grounds that these provisions are repugnant to the due process clause of the Fifth Amendment of the Constitution of the United States. Ford does not seek to nullify the Act but rather seeks only to restrain the operation of the penalty provisions which Ford argues are designed to coerce motor vehicle manufacturers into foregoing their right to judicial review of notification orders of the National Highway Traffic Safety Administration (NHTSA), orders which Ford contends are issued without adherence to the requirements of due process. Defendant William T. Coleman is Secretary of Transportation and is charged with responsibility for administration of the Act. Defendant James B. Gregory is the Administrator of NHTSA, to whom the Secretary of Transportation has delegated his responsibilities under the Act. Defendant Edward H. Levi is the Attorney General of the United States. Under the Act he is authorized to bring suit in the name of the United States against Ford Motor Company on the request of the Secretary of Transportation and the Administrator of NHTSA. The United States of America is named as a defendant since any suit brought against Ford under the Act would be brought in the name of the United States. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1337 (1970).

The defendants have opposed the declaratory and injunctive relief sought by Plaintiff Ford and have moved to dismiss the action. Defendants argue that the exclusive remedy for a stay of the civil penalties is that provided by section 155(c)(1) of the Act as amended, 15 U.S.C. § 1415(c)(1). Defendants further argue that pre-enforcement judicial review should not be permitted and that the plaintiff has failed to demonstrate a probability of success on the merits as to the charge of a safety-related defect and that the plaintiff has failed to satisfy any of the other prerequisites for injunctive relief. What defendants' contentions ignore, however, is the fact that Ford does not seek to stay the Act's civil penalties until the conclusion of the enforcement action brought against Ford by the United States in a separate case (Civil Action No. 75–1345). Rather, Ford seeks to have those very civil penalty provisions declared unconstitutional. For reasons which will follow I would grant Ford's requested relief.

## II. THE STATUTE AS AMENDED

The framework of the Act as amended creates a substantial obstacle to the manufacturer who challenges a determination of the NHTSA Administrator. Section 152, 15 U.S.C. § 1412, provides that if, after testing, inspection and research, the Secretary of Transportation determines that any motor vehicle contains a safety-related defect, he shall notify the manufacturer of this determination and include in the notification all of the information upon which the determination was based. Further the Secretary shall afford the manufacturer an opportunity to present data, views and arguments to establish that there is no defect or that the alleged defect does not

affect motor vehicle safety. If, after the manufacturer's presentation, the Secretary determines that the vehicle contains a safety-related defect, then he shall order the manufacturer to furnish notification to owners, purchasers and dealers concerning the defect and to remedy the defect. This notification, as provided in section 153 of the Act as amended, 15 U.S.C. § 1413, must contain a description of the defect; an evaluation of the risk it causes; a statement of the measures to be taken to remedy the defect; a statement that the manufacturer will remedy the defect without charge; the earliest date on which the defect will be remedied; and a description of the procedure to be followed by the recipient in informing the Secretary whenever a manufacturer, dealer or distributor fails or is unable to remedy the defect without charge. This notification must be furnished within a reasonable time, prescribed by the Secretary, after the manufacturer receives notice of the Secretary's determination of a safety-related defect and the notification must be sent by first class mail to each person who is registered under state law as the owner of a subject vehicle and whose name and address is reasonably ascertainable by the manufacturer through state records. Section 154 of the Act as amended, 15 U.S.C. § 1414, further requires that, in any case where notification is required under section 152, the manufacturer of the vehicle containing a safety-related defect must remedy the defect without charge.[1]

Section 108 of the Act as amended, 15 U.S.C. § 1397, provides that no persons shall fail to furnish notification or remedy any defect or fail to comply with any order applicable to any manufacturer. Section 109, 15 U.S.C. § 1398, provides that, for any violation of section 108's mandate, the violator will be subject to a civil penalty not to exceed $1000 for each violation with the maxi-

mum penalty for any related series of violations set at $800,000. Consequently, a manufacturer who receives notice that the Secretary of Transportation has determined that a safety-related defect exists in the manufacturer's vehicle and that the Secretary orders the manufacturer to notify owners and purchasers of the subject vehicle that a safety-related defect exists and that the manufacturer will remedy the defect without charge must comply with such order or face a fine of up to $800,000 depending on the number of defective vehicles involved. Section 155(c)(1), 15 U.S.C. § 1415(c)(1), provides that if the manufacturer fails to notify owners or purchasers, the court may hold him liable for the civil penalty unless the manufacturer prevails in an enforcement action brought under section 155(a), 15 U.S.C. § 1415(a), or unless the court in the enforcement action restrains the enforcement of the notification order, in which case the manufacturer is not liable for any period during which the effectiveness of the order was stayed. However, the court may restrain enforcement of the notification order only if it determines that the manufacturer has demonstrated that the failure to furnish the notification was reasonable and that he is likely to prevail on the merits.

Furthermore, section 155(b) of the Act as amended, 15 U.S.C. § 1415(b), exposes the manufacturer to an additional civil penalty of up to $800,000. Section 155(b) states that in an enforcement action relating to a notification order issued under section 152, 15 U.S.C. § 1412, the Secretary may order the manufacturer to issue a provisional notification to owners and purchasers of the subject vehicles. This provisional notification must contain a statement that the Secretary has determined that a safety-related defect exists and that the manufacturer is contesting this determination in court; a clear description of

---

1. Section 154, however, does not apply during any period in which enforcement of the order has been restrained by a court in an en-

forcement action under section 155. Nor does section 154 apply where the court has set aside the order.

the Secretary's stated basis for his determination that a safety-related defect exists; the Secretary's evaluation of the risk to motor vehicle safety reasonably related to the defect; any measures necessary to avoid unreasonable hazard; and a statement that the manufacturer will remedy the defect without charge if the Secretary prevails in the court proceeding. Issuance of this provisional notification under section 155(b), 15 U.S.C. § 1415(b), does not relieve the manufacturer of any liability for failing to issue the notification required by section 152, 15 U.S.C. § 1412. Furthermore, under section 155(c)(2), 15 U.S.C. § 1415(c)(2), if the manufacturer fails to send the provisional notification required by section 155(b), 15 U.S.C. § 1415(b), he may be held liable for a civil penalty regardless of whether or not he prevails in the enforcement action in which the manufacturer challenges the validity of the Secretary's determination of a safety-related defect.

Essentially this statute provides for an informal administrative hearing lacking in procedural due process safeguards. Predicated on the administrative determination of a safety-related defect, arrived at from the informal proceeding, are the initial notification and remedy order and the provisional notification order and resultant civil penalties for violations of either order. The manufacturer may avoid the initial civil penalties by prevailing on the merits in an enforcement action. However, if his challenge to the validity of the agency determination fails, he is subject to those civil penalties. It is at this initial order stage that the statute first fails to meet Fifth Amendment due process requirements since the manufacturer must either comply with the initial notification and remedy order and thereby expend very substantial sums of money pursuant to an untested agency determination, or challenge the determination on the merits in an enforcement action and risk the sanctions of substantial civil penalties if he ultimately loses in that suit. These initial civil penalties are not automatically stayed by a manufacturer's challenge to the agency determination in an enforcement action in federal court. Indeed, the manufacturer is liable for the civil penalties unless he prevails in the enforcement action or unless the court preliminarily restrains the initial notification order, and the court may provide such restraint only if the manufacturer demonstrates that his failure to furnish the notification was reasonable and that he is likely to prevail on the merits. Thus, preliminarily at least, the burden of proof in the enforcement action brought by the government to prove that a safety-related defect exists shifts to the manufacturer for purposes of avoiding civil liability for violation of the very order challenged. Therefore, the manufacturer must demonstrate the merits of his arguments by a preponderance of evidence. The most accepted meaning given to this elusive concept is "proof which leads the jury to find that the existence of the contested fact is more probable than its non-existence." McCormick, *Evidence* 794 (2d ed. 1972). The majority's assertion, therefore, that the manufacturer could prevail preliminarily in the enforcement action and thus stay the civil penalties merely by demonstrating that their proof was in equipoise with the government's proof runs afoul of the plain and accepted meaning of burden of proof and the specific words of the statute. The law is and has always been that where the proof is in equipoise the party who has the burden of proof has not met that burden and cannot prevail. Nor do the words of the statute provide that the manufacturer must only mount such evidence as meets the government's submission. I would find this initial procedure of notification and resultant civil penalties unconstitutional because it operates to discourage and deter judicial review of administrative action by placing a high price on access to the courts.

Also predicated on the informal administrative hearing is the provisional notification requirement which, with its concomitant civil penalties, applies re-

gardless of the ultimate disposition of the manufacturer's challenge. The sanctions of up to $800,000 for violation of the provisional notification order are identical to those triggered by violation of the initial notification and remedy order. The manufacturer is at this point deprived of his property without due process for a second time. The manufacturer faces a civil penalty of up to $800,000 for failing to comply with this provisional notification order which is based on a proceeding which did not adequately permit him to answer and counter charges made by the agency, which is applied without judicial approval, and which is imposed whether or not the manufacturer ultimately prevails on the merits. Such a summary action born of an informal proceeding and untouched by the light of judicial review cannot survive tests required by the due process clause of the Fifth Amendment, and so I would hold it unconstitutional.

## III. THE AGENCY PROCEEDING AND PROVISIONAL NOTIFICATION

Section 152(a)(2) of the Act as amended, 15 U.S.C. § 1412(a)(2), provides that the "Secretary shall afford such manufacturer an opportunity to present data, views, and arguments to establish that there is no defect or failure to comply or that the alleged defect does not affect motor vehicle safety." Section 152(b), 15 U.S.C. § 1412(b), provides that "[i]f, after such presentations by the manufacturer . . . , the Secretary determines that such vehicle . . . does not comply with an applicable Federal motor vehicle safety standard, or contains a defect which relates to motor vehicle safety, the Secretary shall order the manufacturer (1) to furnish notification respecting such vehicle . . . to owners, purchasers, and dealers . . . and (2) to remedy such defect or failure to comply . . . ." On April 22, 1975 the Plaintiff, Ford Motor Company, was afforded the opportunity to present its views in response to NHTSA's initial determina-

tion of March 13, 1975 that a safety-related defect existed in the front seat back pins of 1968 and 1969 model year Mustangs and Cougars, of which there are approximately 625,000 still in use in the United States. The NHTSA staff did not present any sworn testimony. No complainants were called to testify. Ford was not granted the right or the opportunity to cross-examine any of the witnesses who testified against Ford. And under the agency's rules Ford did not have the power to subpoena adverse parties or persons who would testify in its behalf. In short, the agency proceeding was informal. On August 12, 1975 NHTSA notified Ford by letter that the agency had determined the existence of a safety-related defect and ordered Ford to send the notice of the NHTSA determination to the present owners of the automobiles in question and to replace the seat pins free of charge to the owners. Ford estimates the cost of compliance with this order at $19 million, and the cost of sending the provisional notification at $500,000.

The agency hearing itself troubles me greatly since it was an informal proceeding which did not accord the manufacturer the basic incidents of procedural due process and yet subsequently exposed the manufacturer to substantial civil penalties as a result of the agency determination derived from the proceeding. Several fundamental aspects of procedural due process were lacking in the agency hearing, such as "the right to confront and cross-examine witnesses." *Jenkins v. McKeithen*, 395 U.S. 411, 428, 89 S.Ct. 1843, 1852, 23 L.Ed.2d 404 (1969); *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 103–04, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) (procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood); *Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) the requirements of cross-examination and confrontation apply in cases where administrative and regulatory actions are

under scrutiny). So also is the right to present evidence "essential to the fair hearing required by the Due Process Clause." And this must perforce include the "right to present oral testimony from other witnesses and the power to compel attendance of those witnesses." *Jenkins v. McKeithen*, supra, at 429, 89 S.Ct. at 1853. As the *Jenkins* court stated, "We do not mean to say that the Commission may not impose reasonable restrictions on the number of witnesses and on the substance of their testimony; we only hold that a person's right to present his case should not be left to the unfettered discretion of the Commission." *Id.* This is particularly true in the case at bar since the consequence of the agency's determination is exposure to substantial civil penalties for noncompliance with the order or to a substantial expenditure of the manufacturer's own funds if it complies with the order. The remarks of the Supreme Court in *Morgan v. United States*, 304 U.S. 1, 14–15, 58 S.Ct. 773, 775, 82 L.Ed. 1129 (1938), are particularly appropriate in this context:

> The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand "a fair and open hearing," essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process.[2]

The legislative history of the amendments indicates that the absence of due process elements at the agency level was no accident. Indeed, the Conference Report on the bill which became the 1974 amendments rejected the Senate's proposal which would have required the Secretary of Transportation to provide the manufacturer with "a statement of his reasons and basis for the findings of a safety-related defect" and would have granted the manufacturer a limited right of cross-examination. H.R.Rep. No. 93–1452, 93d Cong., 2d Sess. 24 (1974), 1974 U.S.Code Cong. & Admin. News 6084.

The troubling aspect of this administrative procedure is that, on the Administrator's determination, derived from an informal hearing, the manufacturer is exposed first to civil penalties of up to $800,000 for failure to comply with the initial notification order, and second, to civil penalties of up to $800,000 for failure to comply with an order to send the provisional notification. Now it is true that the manufacturer may prevail at the preliminary injunction stage and avoid the initial civil penalties for the period during which the notification order was stayed. And, of course, if the manufacturer ultimately prevails in the enforcement action, he will avoid these civil penalties.[3] However, even if the manufacturer ultimately prevails on the merits in the enforcement action, he may still be liable for civil penalties of up to $800,000 for failure to comply with the provisional notification portion of the statute. This provision cannot stand for it imposes civil penalties solely on the basis of an informal administrative proceeding lacking in due process protections, totally untested in a judicial forum. Essentially the manufacturer is exposed to a deprivation of property based on an administrative determination where due process rights were not granted and without an opportunity for judicial review of the validity of the de-

---

2. *See also Baltimore & Ohio R. R. v. United States*, 298 U.S. 349, 368–69, 56 S.Ct. 797, 80 L.Ed. 1209 (1936).

3. I do not endorse this procedure since I believe it erects unconstitutional barriers to access to the federal courts and I will speak to it in part IV. of this opinion.

termination prior to the deprivation of property. As if to add insult to injury, the provisional notification section of the statute applies civil penalties for failure to comply regardless of the outcome of the enforcement action, despite the fact that the manufacturer might well prevail. I do not think that it is premature to pass on the validity of the provisional notification provision. The government has already filed the enforcement action in this court and there is no indication by the government that it will not seek to invoke the provisional notification requirement of the statute.

The provisional notification section of the statute contravenes the Fifth Amendment because it works a deprivation of property without due process of law insofar as its application is based on the informal administrative proceeding discussed earlier and insofar as it denies the manufacturer the right to a judicial examination of the merits of the agency determination before the civil penalties are imposed and thus before the manufacturer is deprived of his property. The Supreme Court stated this concept succinctly in *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972):

> If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented.

*Fuentes* dealt with prejudgment replevin provisions in two state statutes. The issue was whether procedural due process required an opportunity for a hearing before the state authorized its agents to seize property in the possession of one person upon the application of another. The court invalidated both statutes and stated that the "constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his posses-

sions." *Id.* at 80, 92 S.Ct. at 1994. The court went on to state that:

> "This is no new principle of constitutional law. The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendments. Although the Court has held that due process tolerates variances in the form of a hearing "appropriate to the nature of the case" . . . and "depending upon the importance of the interests involved and the nature of the subsequent proceedings [if any] . . ." the Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect.[4] *Id.* at 82, 92 S.Ct. at 1995 (citations omitted).

Thus the "root requirement" of due process is that an "individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* It is unlikely that the present set of facts poses such an extraordinary demand for compliance since the Department of Transportation has been aware of problems with the seat back pins since 1969. There are, of course, differences in the facts of the case at bar and *Fuentes*. But the impact of that decision is unmistakable. The Court has rejected prejudgment deprivations of property and that is precisely what Ford Motor Company as a manufacturer faces in this suit. No court has yet adjudged the validity of NHTSA's determination that a safety-related defect exists in 1968 and 1969 Mustangs and Cougars. Notwithstanding this absence of judicial gloss, the manufacturer is liable for substantial civil penalties for challenging and failing to comply with this untested conclusion. Such an effect does not

---

4. *See Opp Cotton Mills, Inc. v. Administrator*, 312 U.S. 126, 153, 61 S.Ct. 524, 85 L. Ed. 624 (1941) (the requisite hearing must

be held at some point before the Administrative Order becomes final).

comport with the due process concepts expressed in *Fuentes*. Nor is it in line with the due process described in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The issue in *Goldberg* was whether a state which terminated public assistance payments to a particular recipient without affording him the opportunity for an evidentiary hearing prior to termination of his benefits denied the recipient procedural due process in violation of the Fourteenth Amendment. The court held that "due process requires an adequate hearing before termination of welfare benefits, and the fact that there is a later constitutionally fair proceeding does not alter the result." *Id.* at 261, 90 S.Ct. at 1017. With respect to the civil penalties resulting from failure to comply with the provisional notification requirements of the statute, there is not even a "later constitutionally fair proceeding" to pass on the merits of failure to comply with provisional notification demands. The Act as amended summarily declares the provisional notification requirements and imposes sanctions for violations, all without granting the manufacturer a due process context within which to present his case, without regard for whether or not the manufacturer ultimately prevails on the merits and without judicial examination of the agency determination. The words of the Supreme Court in *Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) bear strongly on this point:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to

show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . but also in all types of cases where administrative and regulatory actions were under scrutiny. [Citations omitted.]

Application of this statute's provisional notification provision with the resultant civil penalty deprives the manufacturer of his due process right to challenge the validity of the agency determination before he suffers sanctions from it.

The case of *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), also speaks to the concern for summary procedures which result in deprivation of property. In *Sniadach* the Court struck down a state procedure for prejudgment garnishment of wages. Wages were frozen on a creditor's request and remained frozen until trial was had and the wage earner prevailed on the merits. In the interim the wage earner was deprived of his enjoyment of earned wages without any opportunity to be heard and to tender a defense. In the case at bar, the provisional notification section of the statute provides for a similarly summary procedure with no chance to avoid civil penalties even if the manufacturer ultimately prevails on the merits in the enforcement. This places the manufacturer in a more untoward position than the garnishee in *Sniadach*.[5] Application of the

---

5. Summary procedures may be appropriate and may meet due process requirements in extraordinary situations. *See Sniadach v. Family Finance Corp.*, 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). But in an investigation such as this which has dragged on for six years before an order was issued, the adjective "extraordinary" is

due process guarantees expressed in *Fuentes* and *Sniadach* has not been limited to individuals. Most recently the Supreme Court extended its ban on prejudgment garnishment to corporate funds in *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). In this case the bank account of a corporation was impounded and, absent a bond, put totally beyond use during the pendency of litigation involving an alleged indebtedness for goods sold and delivered. This was accomplished by a writ of garnishment issued by a court clerk without notice or opportunity for an early hearing and without participation by a judicial officer. The only method of dissolving the garnishment was for the defendant to file a bond to protect the plaintiff creditor, and in this way the defendant debtor could challenge the garnishment. The Supreme Court struck down this state statutory procedure stating:

> It may be that consumers deprived of household appliances will more likely suffer irreparably than corporations deprived of bank accounts, but the probability of irreparable injury in the latter case is sufficiently great so that some procedures are necessary to guard against the risk of initial error. We are no more inclined now than we have been in the past to distinguish among different kinds of property in applying the Due Process Clause.

419 U.S. at 608, 95 S.Ct. at 723.

The provisional notification portion of the Act as amended cannot stand insofar as it summarily assigns civil penalties for failure to comply based on an administrative determination arrived at without procedural due process safeguards for the manufacturer, prior to judicial testing of the validity of the agency determination, and without regard for the ultimate disposition of the case. Therefore I would find the provision unconstitutional as contravening the due process clause of the Fifth Amendment.

## IV. THE PENALTY PROVISIONS FOR VIOLATION OF THE ORDER TO NOTIFY AND REMEDY

Under section 152(b) of the Act as amended, 15 U.S.C. § 1412(b), the NHTSA Administrator may, after hearing the manufacturer's presentation at the informal proceeding and determining the existence of a safety-related defect, order the manufacturer to notify owners, purchasers and dealers of the determination and to remedy the defect without charge. If the manufacturer fails to so notify owners or purchasers, he is liable for civil penalties of up to $800,000 under section 155(c)(1) of the Act as amended, 15 U.S.C. § 1415(c)(1). The only statutory method prescribed for avoiding such civil penalties lies in a challenge to the agency determination of a safety-related defect in an enforcement proceeding brought by the government after the manufacturer refuses to comply with the notification and remedy order issued pursuant to section 152(b), 15 U.S.C. § 1412(b). Constitutional difficulties arise because the civil penalties are not stayed during the pendency of the enforcement litigation and are in fact only imposed if the manufacturer loses the suit. Preliminarily the court may restrain the enforcement of the notification and remedy order in which case the manufacturer is not liable for any period during which the order was stayed. But the court may only preliminarily restrain the order if the manufacturer demonstrates that his failure to furnish the notification was reasonable and that he is likely to prevail on the merits. This statutory framework locks the manufacturer in a difficult dilemma if he feels the agency determination was not correct. He may capitulate and obey the order, thus incurring very substan-

---

hardly warranted. For investigations which are not so ongoing as this one, there are methods of accomplishing the same objective of protecting the driving public staying within the bounds of procedural due process. *See* Hearings Before the Senate Commerce Committee on S. 355, 93d Cong., 1st Sess. 6 (1973).

tial expenditures to notify and remedy a defect which he may in good faith believe is not safety-related.[6] Or he may choose not to comply with the order in which case he faces an enforcement suit which is essentially a trial *de novo* with the burden of proof on the government. *United States v. General Motors Corp.*, 518 F.2d 420, at 426 (D.C.Cir., 1975). Under section 155(a)(1) of the Act as amended, 15 U.S.C. § 1415(a)(1), any action brought by the manufacturer challenging the order would be consolidated with the enforcement action. Concurrent with the trial *de novo*, of course, are the civil penalties provisions mentioned earlier, and the manufacturer risks imposition of these penalties if he challenges the agency determination in a judicial forum and is unsuccessful. This must of necessity create an apprehension in the mind of the manufacturer that indeed chills his access to the courts, for he knows that the penalty for losing the suit may be $800,000.[7] Such a bar to federal courts will not be tolerated by the Due Process Clause of the Fifth Amendment, and such inhibiting provisions have been struck down by the Supreme Court many times.

The guiding principle in this area of access to federal courts is expressed in *Life & Cas. Ins. Co. v. McCray*, 291 U.S. 566, 54 S.Ct. 482, 78 L.Ed. 987 (1934). There the court upheld a state statute imposing a surcharge on insurance companies which failed to pay claims when demand was made within the time specified in the policies. The court noted that the insurer was not penalized for taking a controversy on the validity of the claim into court but was rather penalized for refusing to make payment in accordance with its contract and, fur-

ther, the penalty was in an amount reasonably proportional to the loss or inconvenience likely to be suffered by the beneficiary of the policy. However, Mr. Justice Cardozo indicated that:

> The price of error may be so heavy as to erect an unfair barrier against the endeavor of an honest litigant to obtain the judgment of a court. In that event, the Constitution intervenes and keeps the courtroom open.

291 U.S. at 574–75, 54 S.Ct. at 486.

The leading case in this point is *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Two Minnesota statutes were passed in 1907 which directed railroads in that state to establish certain rates for transportation of passengers and commodities. Violations of the passenger rate statute was a felony punishable by a fine of $5000 and 5 years imprisonment while violation of the commodities rates was a misdemeanor. Stockholders of a number of the railroad companies filed suit in federal court against their companies seeking to enjoin the railroad companies from publishing or adopting the rates set forth in the two Acts and to enjoin other defendants including state Attorney General Young from attempting to enforce the statutes by instituting any action against the railroad companies or their officers. The suits also alleged that the new rates were unjust, unreasonable and confiscatory and deprived them of their property without due process of law. The lower court restrained Attorney General Young from enforcing the penalties, and he violated the injunction by enforcing penalties against one of the railroad companies. Consequently, Young was adjudged in contempt of court by the lower court. The officers

---

6. A safety-related defect is one which creates an unreasonable risk of accidents or an unreasonable risk of death or injury to persons in the event accidents occur. 15 U.S.C. § 1391. *See United States v. General Motors*, 518 F.2d 420, at 435 (D.C.Cir. 1975).

7. This is exactly what the Congress intended. The House Report on the 1974 amendments

states that "when a manufacturer decides to contest the Secretary's determination of a defect or failure to comply, he does so at the risk of facing an enforcement proceeding brought by the Government and incurring a civil penalty." H.R.Rep.No.93–1191, 93d Cong., 2d Sess. 18 (1974), 1974 U.S.Code Cong. & Admin.News 6052.

and directors of the railroad companies had declined to file suit to have the statutes declared illegal because of the severity of the penalties prescribed for violations and the "ruinous consequences which would inevitably result from failure on their part to obey the said laws and orders,—a result which no action by themselves, their stockholders or directors, could possibly prevent." *Id.* at 130, 28 S.Ct. at 445. The penalties were alleged to be "so drastic that no owner or operator of a railway property could invoke the jurisdiction of any court to test the validity thereof, except at the risk of confiscation of its property, and the imprisonment for long terms . . . of its officers, agents and employees." *Id.* at 131, 28 S.Ct. at 445. Thus the company was liable to be deprived of its property because it could only seek a judicial hearing on the unconstitutionality of the statutes at the risk, if mistaken, of being subjected to substantial penalties resulting in confiscation of its property, while obedience to the statutes might also result in the long run in the same confiscation by a slower process. *Id.* at 144–45, 28 S.Ct. 441. The Supreme Court held that the statutes were invalid on their face because of the penalties. *Id.*

> The company, in order to test the validity of the acts, must find some agent or employé to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts . . . for the purpose of testing its validity. The officers and employé could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid. . . . It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation,

the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights.

*Id.* at 145–7, 28 S.Ct. at 448–49.

The court rejected the suggestion that the proper method of testing the acts' validity was disobedience:

> To await proceedings against the company in a state court, grounded upon a disobedience of the act, and then, if necessary, obtain a review in this court by writ of error to the highest state court, would place the company in peril of large loss and its agents in great risks of fines and imprisonment if it should be finally determined that the act was valid. This risk the company ought not to be required to take. Over eleven thousand millions of dollars, it is estimated, are invested in railroad property, owned by many thousands of people . . . and they are entitled to equal protection from the laws and from the courts, with the owners of all other kinds of property,—no more, no less. The courts having jurisdiction, Federal or state, should, at all times, be open to them as well as to others, for the purpose of protecting their property and their legal rights.

209 U.S. at 165, 28 S.Ct. at 456.

The message of *Ex parte Young* is clear. Penalties cannot be employed by legislatures to inhibit judicial review of the validity of statutes or administrative determinations. This principle was followed in *Oklahoma Operating Co. v. Love*, 252 U.S. 331, 40 S.Ct. 338, 64 L. Ed. 596 (1920). There a corporation sued the state corporation commission seeking to enjoin the commission from enforcing its order limiting certain rates. Under a state statute there was no opportunity for judicial review of a legislative rate fixed by the commission except by way of defense to contempt proceedings. The penalty for disobeying a commission order was a fine of up to $500 per day. Relying on *Ex parte*

*Young,* the court held the penalty scheme unconstitutional:

> [T]he only judicial review of an order fixing rates possible under the laws of the state was that arising in proceedings to punish for contempt. . . . By boldly violating an order a party against whom it was directed may provoke a complaint; and if the complaint results in a citation to show cause why he should not be punished for contempt, he may justify before the Commission by showing that the order violated was invalid, unjust or unreasonable. If he fails to satisfy the Commission that it erred in this respect, a judicial review is opened to him by way of appeal on the whole record to the Supreme Court. But the penalties, which may possibly be imposed, if he pursues this course without success, are such as might well deter even the boldest and most confident. The penalty for refusal to obey an order may be $500; and each day's continuance of the refusal after service of the order it is declared 'shall be a separate offense.' The penalty may apparently be imposed for each instance of violation of the order. . . . Obviously a judical review beset by such deterrents does not satisfy the constitutional requirements, even if otherwise adequate, and therefore the provisions of the acts relating to the enforcement of the rates by penalties are unconstitutional without regard to the question of the sufficiency of those rates.

252 U.S. at 336–37, 40 S.Ct. at 340.

These cases point out the controlling rule of law for review of administrative orders in federal courts:

> [T]he right to a judicial review must be substantial, adequate, and safely available; but that right is merely nominal and illusory if the party to be affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to ask for the protection of the law.

*Wadley Southern Ry. v. Georgia,* 235 U.S. 651, 661, 35 S.Ct. 214, 218, 59 L.Ed. 405 (1915).

In *Wadley,* the railroad, disputing an order of the Railroad Commission, chose not to comply with the order, thus placing it in violation of a statute which required compliance with every order of the Commission by persons subject to the public utility law. Violators were subject to a fine of $5000. Discussing cases involving penalties for violations of the legislative orders of commissions, including *Ex parte Young,*[8] the court said:

> These cases do not proceed upon the idea that there is any want of power to prescribe penalties heavy enough to compel obedience to administrative orders, but they are all based upon the fundamental proposition that under the Constitution penalties cannot be collected if they operate to deter an interested party from testing the validity of legislative rates or orders legislative in their nature. Their legality is not apparent on the face of such orders, but depends on a showing of extrinsic facts. A statute, therefore, which imposes heavy penalties for violation of commands of an unascertained quality is, in its nature, somewhat akin to an *ex post facto* law, since it punishes for an act done when the legality of the command has not been authoritatively determined. Liability to a penalty for violation of such orders, before their validity has been determined, would put the party affected in a position where he himself must, at his own risk, pass upon the question. He must either obey what may finally be held to be a void order, or disobey what may ultimately be held to be a lawful order. If a statute could constitutionally impose heavy penalties for violation of commands of

---

8. *See Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 53–4, 29 S.Ct. 192, 53 L.Ed. 382 (1909) and *Missouri Pac. Ry. v. Tucker,* 230 U.S. 340, 350–51, 33 S.Ct. 961, 57 L.Ed. 1507 (1913) for similar results.

such disputable and uncertain legality, the result inevitably would be that the carrier would yield to void orders, rather than risk the enormous cumulative or confiscatory punishment that might be imposed if they should thereafter be declared to be valid. 235 U.S. at 662–63, 35 S.Ct. at 218.

In *United States v. St. Regis Paper Co.*, 285 F.2d 607, 615 (2d Cir. 1960), *aff'd*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed. 2d 240 (1961), the court upheld a daily penalty provision in the Federal Trade Commission Act which was triggered by a corporation's failure to submit a requested special annual report. The penalty provision was saved, however, only by the availability of the Declaratory Judgment Act and the Administrative Procedure Act which the court held would be available to the corporation in the pre-enforcement period. In the case at bar it does not appear that pre-enforcement review is available.[9] Thus the Second Circuit's remarks are apposite:

> If judicial review were in fact limited to enforcement proceedings instituted by the Commission, and a daily forfeiture were collected for a failure to comply, the procedure might not meet the established standards of due process.

*Cf. Oklahoma Operating Co. v. Love*, 1920, 252 U.S. 331, 40 S.Ct. 338, 64 L. Ed. 596, 285 F.2d at 615.

Finally, in *United States v. Pacific Coast European Conference*, 451 F.2d 712 (9th Cir. 1971), a suit brought by the government to assess statutory penalties against three shipping conferences for using unlawful dual-rate shipping contracts, the court of appeals, citing *Oklahoma Operating Co. v. Love, Missouri Pacific Ry. Co. v. Nebraska* and *Ex parte Young, supra,* and specifically relying on *Wadley Southern Ry. Co. v. Georgia, supra,* refused to apply the statutory penalty for non-compliance with the Shipping Act of 1961 during the time the defendants were judicially testing the validity of that Act. The statutorily mandated fate of the defendant conferences in *Pacific Coast* during the pendency of their litigation was in a very real sense less burdensome than that faced by the manufacturer in the case at bar. The conferences could either accept the Commission's dual-rate order or forego any dual-rate contracts while they pursued their judicial remedy. The appellate court quickly dismissed this "riskless remedy" by noting that apart from the fact that acceptance of the Commission's order might moot the case, neither remedy "comports with defendant's constitutional right of contract except where impaired by valid statute or administrative order." 451 F.2d at 718. I would submit that the Fifth Amendment due process rights at issue here are every bit as important as this constitutional right of contract and demand the same consideration by this court. Penalties may not be assessed under a statute whose very validity is challenged by the party against whom sanctions are sought. The pattern in all of these cases emerges from the same loom whose fabric we examine in this case. That pattern consists of a statutory framework designed to deter judicial review of legislative or administrative determinations. It is of little consequence that the sanctions in this case are civil rather than criminal penalties. Nor is it of significant moment that the penalties imposed in this statute are not cumulative on a daily basis. The penalties in this Act as amended are substantial; they deprive the manufacturers of property; and their purpose is to inhibit judicial review. This is the common thread which runs through all of these cases and which binds our present case to those precedents. The "fair price of adventure" is too high,[10] and the argument that automobile manufacturers may be able to afford such penalties does not overcome the inevitably chilling effect which the penalty provisions in-

---

9. *See General Motors Corp. v. Volpe*, 321 F. Supp. 1112, 1131 (D.Del.1970), *aff'd*, 457 F.2d 922 (3d Cir. 1972).

10. *See Life & Cas. Ins. Co. v. McCray*, 291 U.S. 566, 575, 54 S.Ct. 482, 78 L.Ed. 987 (1934).

still. The legacy of *Ex parte Young* is directed against the erection of inhibiting barriers to judicial review of legislative or administrative action in proper federal cases. I do not mean to suggest that safety-related defects in motor vehicles should not be expeditiously rectified; nor do I intimate that the burden of remedy should not fall on the manufacturer. However, expedition must be accomplished through constitutional methods which comport with procedural due process concepts of dealing with property. The penalty scheme accompanying the notification and remedy order in the Act as amended does not meet such Fifth Amendment requirements and I therefore find it unconstitutional.

## V. CONCLUSION

Finding the penalty schemes accompanying the provisional notification order and notification and remedy order provisions of the Act as amended repugnant to the due process clause of the Fifth Amendment, I would declare such provisions in section 155(c)(1) and section 155(c)(2) as read in concert with sections 108, 109 and 152 unconstitutional and I would restrain their operation and enforcement.